**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 99-20128
_____

KONA TECHNOLOGY CORP.,

Plaintiff-Counter Defendant,
Appellant, Cross-Appellee,

versus

SOUTHERN PACIFIC TRANSPORTATION CO.;
ST. LOUIS SOUTHWESTERN RAILWAY CO.,

Defendants-Cross Defendants-Counter Claimants,
Appellees-Cross Appellants,

and

CHEVRON CHEMICAL CO.,

Defendants-Cross Claimant-Third Party Plaintiff-
Counter Defendant, Appellee-Cross Appellant,

versus

SPCSL CORPORATION,

Third Party Defendant- Defendant- Counter Claimant,
Appellee-Cross Appellant.

Appeals from the United States District Court
for the Southern District of Texas

September 13, 2000

Before BARKSDALE, BENAVIDES, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Factual and Procedural History

I.      Factual Background

This case involves a complex dispute over rail, freight, and shipping charges.  The parties to this action are: Chevron Chemical, Co. ("Chevron"); Kona Technological Corp. ("Kona"), Southern Pacific Transportation Co. ("SP"); St. Louis Southwestern Railway Co. ("St. Louis"); and SPCSL Corp. ("SPCSL")  (St. Louis, SP, and SPCSL are collectively referred to as the "Railroads.").

In 1982, Gulf Oil Corp. ("Gulf") entered into a contract ("Contract 245") with the Railroads to ship plastic products by rail.  Contract 245 provided for rail transportation for plastic products manufactured from Gulf's plants located at Orange, Texas and Eldon, Texas.  In 1985, Gulf merged with Chevron, and consequently Chevron became a party to Contract 245.

In 1985, Chevron entered a new contract with SP and St. Louis ("Contract 6018"). SPCSL became a party to the contract in 1990.  Contract 6018 provided base rates for the movement by rail of plastic products moving from same or related origins to same or related destinations.  Contract 6018 also provided a most favored nation clause which contained the following language:

> Section 20 - Competitive Rate Structure: During the term of this Contract, Carriers shall provide Chevron with net rail contract rates that are equal or lower than net rates of competitors of Chevron with respect to the movement of same commodities [] from same or related origins to same or related destinations as included in addendums to this contract.  In the event Chevron has reason to believe that a competitor has lower net rate or minimum weight, then Chevron will notify carriers in writing and request carriers to certify in writing that Chevron has the equivalent lower contract net rate.

(emphasis added).

2

Chevron also negotiated individual contracts with connecting carriers. Because the shipment of Chevron's products included destinations that were not on the Railroads' line, connecting carriers were used to transport Chevron's products to destinations not covered by the Railroads. Contract 6018 provided base rates for the transportation of products to destinations on the Railroads' line. The individual carriers negotiated "through rates" with Chevron which provided rates for the transportation of products from the Railroads to each destination covered by the connecting carriers. Contract 6018, Chevron's contract with the Railroads, provided that:

> Chevron and Carriers are in the process of negotiating through rates (Base Rates) and until such through rates are agreed upon and are included in the Agreement or other Agreements to which Chevron and Carriers are party (with or without additional carrier), the published tariff rates will apply, less refund allowances shown in the attached addendums.

The base rates that applied to Chevron and the Railroads did not apply to the through rates negotiated between Chevron and the connecting carriers. Thus, the connecting carriers' contract contained provisions that addressed terms such as volume commitments, rates, and storage in-transit, which were not subject to the agreement between Chevron and the Railroads. Eventually, Chevron negotiated 26 separate contracts with connecting carriers.

The Railroads' marketing department was charged with monitoring the rates to insure compliance with Section 20. However, the Railroads failed to closely monitor the rates and keep accurate records. Chevron's initial rates under Contract 6018 were higher than that of Chevron's competitors. The Railroads never gave Chevron a price adjustment under Section 20 during the term of the contract. Because of the confidentiality clauses in the contracts between Chevron, its competitors, and the Railroads, Chevron could not ascertain the rates the Railroads charged their

3

competitors nor could Chevron disclose to its competitors the rates it was receiving from the Railroads. However, the Railroads were in a position to know, or could have determined the rates it was charging Chevron and its competitors in order to comply with the favored nation clause of Section 20.

In 1992, Chevron acquired a report from A. T. Kearney, an independent consulting firm, which indicated that Chevron's rates with the Railroads were average, and thus not competitive. Later that same year, Chevron asked the Railroads to check Chevron's rates with other shippers. A Railroad representative contacted Chevron and stated that Chevron's rates compared favorably to those of other plastics producers. In 1993, Chevron requested written certifications under Section 20. The Railroads replied that they could not respond unless Chevron identified a specific competitor that it believed was receiving a more favorable rate. Because Chevron did not have access to the rates of its competitors, Chevron responded that it was not required to identify a specific competitor and provided a list of regional competitors. The Railroads never certified Section 20 compliance.

Kona performed freight audit work for Gulf before the merger and subsequently Chevron. As a freight auditor, Kona would monitor Chevron's competitor's freight rates to determine whether the Railroads were complying with Section 20. Because Kona was not party to the agreement between Chevron and the Railroads, and thus a third party auditor, Kona had access to the rates of Chevron's competitors. However, Kona could not disclose to Chevron the rates of its competitors nor could it disclose Chevron's rates to Chevron's competitors. The agreement between Kona and Chevron provided that Chevron would pay Kona a percentage of the overcharges it detected that resulted from Section 20 violations. The agreement also entitled Kona to submit claims to the Railroads in Chevron's name.

4

During the course of the agreement between Kona and Chevron, Kona made several efforts to demonstrate to Chevron that Section 20 was being violated by the Railroads. Chevron, nevertheless failed to act on Kona's efforts, and in 1993 terminated its agreement with Kona. During the course of the termination, Chevron agreed that: (1) Kona could take those actions which it was entitled to take prior to the termination date; (2) Chevron would not object to those actions; and (3) Chevron would continue to cooperate with Kona, to ensure that it paid the Railroads only that which the Railroads were lawfully entitled to receive, until Kona had exhausted reasonable efforts to pursue the claims (including Section 20 claims) Kona identified.

Kona submitted a request for a Section 20 certification to the Railroads. The Railroads replied that they could not recognize a request from Kona.

In 1994, Kona filed suit in federal district court. Because of the complexity of the issues and claims presented by the multiple parties involved, first we outline the claims the parties made below.

I.    Procedural History

A.    Parties' Claims Below

Kona filed an action in Texas state district court on its own behalf and as a contractually authorized representative of Chevron against the Railroads for breach of Contract 6018. Kona also sued the Railroads for tortious interference with its contract with Chevron. Additionally Kona sued Chevron for declaratory relief, attorneys' fees and quantum meruit. Chevron and the Railroads removed the case to federal district court.

Chevron filed a cross action and a third party action against the Railroads for breach of Section 20, the favored nation clause. The Railroads filed a cross action claim against Chevron for restitution of Section 20 overcharges it erroneously paid Chevron. The Railroads' restitution claim

5

was resolved before trial. Chevron and the Railroads settled the restitution claim for $282,959. Thus, the Railroads' remaining claims are for prejudgment interest and attorneys' fees.

B.      Trial Court's Rulings and Final Judgment

Prior to trial, Chevron filed a Motion to Strike Kona as a plaintiff regarding Chevron's contract claim against the Railroads. The Railroads filed a motion to dismiss Kona's contract claim, and tortious interference of contract claim. The district court granted Chevron's Motion to Strike and the Railroads' motion to dismiss Kona's contract claim, but denied the Railroads' motion to dismiss Kona's tortious interference with contract claim. The district court conducted an extensive document intensive bench trial. At the conclusion of trial, the district court issued 53-pages of findings of fact and conclusions of law. The district court ruled that Kona, pursuant to its contract with Chevron, was entitled to receive 50% of the actual amounts collected by Chevron from the Railroads, or alternatively, 50% in quantum meruit (with interest), due to Section 20 overcharges. The court also ruled that Chevron shall recover $13,409,387.00 against the Railroads minus the $282,959.00 it stipulated prior to trial that represented the amount the Railroads was entitled to recover for erroneous payment of overcharges. The court also ordered that all parties bear their own attorneys' fees and costs. The parties timely filed notices of appeal challenging the district court's rulings and final judgment.

### Discussion

The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo. See Gebreyesus v. F.C. Schaffer & Assoc's, Inc.,

6

204 F.3d 639, 642 (5th Cir.2000); F.D.I.C. v. McFarland, 33 F.3d 532, 536 (5th Cir.1994).  Since

this case comes to us through diversity jurisdiction, we apply the substantive law of Texas.  See Erie

R.R. v. Tompkins, 304 U.S. 64, 78-79, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).

I.      Kona's Claims

Kona claims that the district court erred because the court precluded Kona from presenting

evidence regarding the proper interpretation of Section 20 of the shipping agreement between

Chevron and the Railroads.  Kona claims also that the district court erred when it precluded Kona

from presenting evidence to show the amount of overcharge Chevron was entitled to receive from

the Railroads due to Section 20 violations.  Finally, Kona claims that the district court improperly

denied its request for attorneys' fees.

The district court in a pretrial ruling dismissed Kona's contractual claim against the Railroads

because Kona was not a signatory to the shipping agreement between the Railroads and Chevron.

As such, the Railroads and Chevron maintain that the district court properly barred Kona from

presenting evidence regarding Section 20 violations to prove damages because Kona was not a party

to the shipping contract between Chevron and Railroads.  In other words, the Railroads and Chevron

assert that only the parties to the shipping agreement may present evidence regarding damages for

Section 20 violations.  Chevron also contends that the district court correctly denied Kona's request

for attorneys' fees.

A.      Exclusion of Evidence on Section 20 Violations  and Damages

We review a district court's decision to admit or to exclude evidence under the abuse of

discretion standard.  See United States v. Wallace, 32 F.3d 921, 927 (5th Cir.1994).  Thus, we will

not reverse a district court's evidentiary rulings unless substantial prejudice results to the complaining

7

party. See Fed. R. Evid. 103(a); Munn v. Algee, 924 F.2d 568, 573 (5th Cir.), cert. denied, 502 U.S. 900, 112 S.Ct. 277, 116 L.Ed.2d 229 (1991). The burden of proving substantial prejudice lies with the party asserting error. FDIC v. Mijalis, 15 F.3d 1314, 1318 (5th Cir.1994).

Because this case comes to us under diversity jurisdiction, we are Erie bound to apply Texas substantive law. In order for any litigant to maintain a suit it is necessary that he have standing to litigate the matters in issue. Hunt v. Bass, 664 S.W.2d 323, 324 (Tex. 1984). Generally, only parties to a contract may sue to enforce the rights provided in the four corners of the agreement. However, it is well settled that a person who is not a party to a contract may nevertheless have standing to enforce the contract if it was made for that person's benefit. See Paragon Sales Co., Inc. v. New Hampshire Ins. Co., 774 S.W.2d 659, 661 (Tex.1989); Knox v. Ball, 144 Tex. 402, 191 S.W.2d 17, 23-24 (1945); see also Texas State Employees Union/CWA Local 6184 A.F.L.C.I.O. v. Texas Workforce Commission, 16 S.W.3d 61, 67 (Tex. App. –Austin 2000); Barnes v. Wendy's Int'l, Inc., 857 S.W.2d 728, 730-31 (Tex.App.--Houston [14th Dist.] 1993, no writ); Gonzalez v. City of Mission, 620 S.W.2d 918, 922 (Tex.App.--Corpus Christi 1981, no writ).

Kona does not refer to any contractual language in the shipping agreement between Chevron and the Railroads that indicates that Kona was an intended third party beneficiary to the agreement. Furthermore, our independent review of the shipping agreement at issue does not reveal any language that suggests that Kona was intended to be a beneficiary of the rights created under the agreement. Additionally, in Kona's proffer before the district court during the final hearing on damages, Kona did not refer the court to any language in the shipping agreement between the Railroads and Chevron that would indicate that it was an intended beneficiary of the agreement.

Nonetheless, Kona refers the court to Texas caselaw to buttress its claim that it has a

8

justiciable interest in the shipping agreement between Chevron and the Railroads. However, the principal cases that Kona refers to involve statutes that created standing. See Lokey v. Texas Methodist Foundation, 479 S.W.2d 260 (Tex. 1972)(Article 7425b–39 of the Texas Trust Act created standing for any person affected by or having an active interest in the administration of the trust estate); Maurer v. Sayre, 833 S.W.2d 680, (Tex. App. –Fort Worth 1992)(Tex. Prob.Code Ann. §§ 10, 3(r) provides that any person interested in an estate has standing to be heard in a probate proceeding); In re Rasco, 552 S.W.2d 557 (Tex. Civ.App. – Dallas 1977)(a surety is an interested person under section 408(a) under the Texas Probate Code). Kona does not argue that it is entitled to standing by statute. Although the amount of Kona's recovery under its contract with Chevron was affected by the amount Chevron recovered from the Railroads under the shipping agreement, Kona does not show that the rights established under the shipping agreement were intended to benefit Kona. As such, the district court did not abuse its discretion when it precluded Kona from introducing evidence to establish breach of contract and damages under the shipping agreement between the Railroads and Chevron.[1]

B.      Kona's Request for Attorneys' fees

Kona claims that because it prevailed against Chevron at trial, the district court erred when it denied Kona's request for attorneys' fees. Kona points the court to sections 37.009 and 38.001 of the Texas Civil Practice and Remedies Code to supports its claim of attorneys' fees. Section 37.009, which is under the Texas Declaratory Judgment Act, provides that the court "may" award attorneys' fees. Bocquet v. Herring, 972 S.W.2d 19, 20 (Tex. 1998). Thus, trial courts are afforded

[1] Because we find that Kona does not have standing to assert claims under the shipping agreement between Chevron and the Railroads, we need not review Kona's claim that the district court erroneously interpreted the agreement.

9

discretion in deciding whether to award attorneys' fees or not. <u>Commissioners Court v. Agan</u>, 940 S.W.2d 77, 81 (Tex. 1997); <u>Barshop v. Medina County Underground Conservation Dist.</u>, 995 S.W.2d 618, 637-38 (Tex. 1996).

Section 38.001 provides that a party "may" recover reasonable attorneys' fees in suits based upon a written contract. <u>See</u> <u>Stable Energy v. W.B. Newberry</u>, 999 S.W.2d 538, 556 (Tex.App. –Austin 1999); <u>Budd v. Gay,</u> 846 S.W.2d 521, 524 (Tex.App. Houston [14th Dist.] 1992, no writ). If a party prevails in his or her *breach* of contract claim and recovers damages, he or she is *entitled* to attorneys' fees. <u>See</u> <u>Green Int'l, Inc. v. Solis</u>, 851 S.W.2d 384, 390 (Tex. 1997)(emphasis added). Thus, attorneys' fees under section 38.0001 are mandatory.[2]

Kona is not entitled to attorneys' fees under Section 38.001 because Kona's judgment and recovery against Chevron were not based on a finding of breach of contract. Our review of the trial court's conclusions of law does not reveal a finding of breach committed by Chevron. The trial court stated that "Kona is entitled under its Freight Bill Audit Agreement to a declaration of its right to receive fifty percent (50%) of the actual amounts collected by Chevron Chemical . . . from the railroads, or alternatively, fifty percent (50%) in quantum meruit (with interest), due to the Section 20 overcharge." (parentheticals in the original). Because the district court found in favor of Kona based on its declaratory action, Kona does not prove that the court erred when it declined to award attorneys' fees under Section 38.001.

---

[2] Because section 37.009 provides that the court "may" award attorneys' fees and section 38.001 provides that a party "may" recover attorneys' fees, it appears counterintuitive to construe the former as discretionary and the latter as mandatory. However, notwithstanding that 38.001 uses the term "may," the Texas Supreme Court has declared that attorneys' fees under section 38.001 are not discretionary. <u>See</u> <u>Bocquet,</u> 972 S.W.2d at 20 ("Statutes providing that a party 'may recover,' 'shall be awarded,' or 'is entitled to attorneys' fees are not discretionary.'"). As such, we are <u>Erie</u> bound to adhere to the state high court's interpretation.

Regarding an award of attorneys' fees under section 37.009 of the Declaratory Act, a prevailing party is not entitled to attorneys' fees simply as a matter of law. United Loans, Inc. v. Pettijohn 955 S.W.2d 649. "Entitlement depends upon what is equitable and just and the trial judges's power is in that respect discretionary." Id. at 654 (citing Worford v. Stamper, 801 S.W.2d 108, 109 (Tex. 1990)). In the instant case, the district court ruled that the attorneys' fees should be determined by the contingency fee agreement between Kona and its counsel. Furthermore, the district court awarded Kona $138,255.91 for technology expenses Kona incurred to pursue the underlying litigation. Under these circumstances, Kona does show that the district court's denial of attorneys' fees in this respect was an abuse of discretion, inequitable, or unjust.

II.     Chevron versus Kona

Chevron claims that the district court erred when it declared that Kona was entitled to recover 50% of Chevron's judgment from the Railroads, or in the alternative, 50% in quantum merit due to Section 20 overcharges.[3] Kona also contends that Chevron breached its fiduciary duty as an agent because Chevron did not authorize Kona to sue the Railroads for Section 20 violations. As such, Chevron maintains that Kona forfeited any recovery that Chevron collected from the Railroads for Section 20 violations.

A.      Breach of Fiduciary Duty and Forfeiture

Chevron failed to include these issues in the parties' Joint Pre-Trial Order, and it now raises them for the first time on appeal. "It is a well-settled ruled that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial."

_____

[3] The amount the district court awarded Kona was $6,846,173.00 which is half of the initial $13,692,346.00 that the district court awarded Chevron on its breach of contract claim against the Railroads for Section 20 violations.

McGehee v. Certainteed Corp., 101 F.3d 1078, 1080 (5th Cir. 1996); Branch-Hines v. Herbert, 939 F.2d 1311, 1319 (5th Cir. 1991).   The claims, issues, and evidence are narrowed by the pretrial order to expedite the proceeding. Elvis Presley Enterprises, Inc. v. Capece, 40 F.3d 188, 206 (5th Cir. 1998).   Once the pretrial order is entered, it controls the scope and course of the trial. See Fed.R.Civ.Proc. 16.   If a claim or issue is omitted from the order, it is waived, even if it appeared in the complaint. Elvis, 40 F.3d at 206;  Valley Ranch Dev. Co. v. FDIC, 960 F.2d 550, 554 (5th Cir.1992); Flannery v. Carroll, 676 F.2d 126, 129 (5th Cir.1982).   Because Chevron omitted its claims of breach of fiduciary duty and forfeiture from the joint pre-trial order, they are waived.

B.       Kona's Recovery for Section 20 Violations

Chevron claims that the district court erred when it ruled that Kona was entitled to 50% of its recovery from the Railroads for Section 20 violations. The interpretation of a contract is a question of law which we review de novo.  Nautilus Insurance Co. v. Zamora, 114 F.3d 536, 538 (5th Cir. 1997).   The Freight Bill Audit Agreement provides:

> Chevron shall pay contractor (Kona) a percent of the actual amounts collected from  the carriers, including interest, when paid, according to the percentages agreed upon as shown on Attachment A of this contract.

.
(parenthetical added).  Attachment "A" specifies that Chevron shall pay the contractor (Kona) 50% of the actual claim collected.  The agreement also essentially provided an at-will termination clause with a 60-day written notice requirement.  Thus, the agreement created a limited agency relationship between Kona, the agent, and Chevron, the principal.

Essentially, Chevron argues that Kona is not entitled to any percentage of its recovery from the Railroads because the audit work that Kona performed under the January 1, 1991 Freight Bill

12

Audit Agreement did not result in the collections of any overcharges prior to Chevron terminating the agreement on April 28, 1993. In other words, Chevron apparently argues that any collections for overcharges due to Section 20 violations resulted from its own efforts to pursue its cross-claim against the Railroads. Because Kona sued the Railroads for Section 20 violations after Chevron terminated the agency relationship on April 28, 1993, Chevron contends that Kona is not entitled to any percentage of its recovery from the Railroads.

An agent who has not breached the terms of the contract may recover fees and commissions provided under the contract before the transaction is consummated. See Ramesh v. Johnson, 681 S.W.2d 256, 259 (Tex. App–Houston [14th Dist.] 1994, writ ref'd n.r.e.). Thus, a principal's termination of an agency agreement for reasons other than breach of contract before the underlying transaction is consummated does not ipso jure preclude an agent from recovering fees or commissions provided under the express language of the agreement. See id. at 259; Goodwin v. Gunter, 109 Tex. 56, 185 S.W. 295, 296 (Tex. 1916).

In the instant case, Chevron did not allege in the joint pre-trial order that Kona was in breach of the Freight Audit Bill Agreement nor did the district court find that Kona breached the agreement by bringing suit against the Railroads. Furthermore, Kona made several attempts prior to the termination of the Audit Agreement to notify Chevron of possible Section 20 violations. In February 1993, Kona sent a letter to Chevron stating that a "possible violation of Section 20 has occurred." In March 1993, Kona made two attempts to notify Chevron of possible Section 20 violations. Kona suggested that Chevron review its freight bill records for bills sent by the Railroads because the bills on their face may indicate lower rates that the Railroads charged other shippers. Kona also informed Chevron that another shipper of plastic resins was receiving a lower rate from the Railroads for

13

shipments to Virginia.   In May 1993, Kona made a written certification request to the Railroads pursuant to Section 20 of Contract 6018.  The Railroads responded that  the request would not be recognized because Kona was not a proper party to make the request.   Chevron officials orally and in writing disagreed with the Railroads' assessment and later that same day made a Section 20 certification request with the Railroads.   Although Chevron purports that it did not act on Kona's recommendations regarding Section 20 violations until after the Audit Agreement was terminated, Chevron's recovery for Section 20 violations was related to overcharges that occurred during the existence of the audit freight agreement.   Kona was the only company that performed freight bill audits to detect Section 20 violations for Chevron.   Furthermore, our review of the Audit Agreement does not indicate that the collection of the overcharges due to Section 20 violations must have occurred before the contract was terminated in order for Kona to be compensated by Chevron. Under these circumstances, the district court did not err when it found that Kona was entitled under the Audit Agreement to half of Chevron's recovery due to Section 20 overcharges notwithstanding that the collection of overcharges did not occur during the existence of the Audit Agreement.

In the alternative, the district court's alternative judgment awarding 50% in quantum meruit was not erroneous.  Quantum meruit is an equitable remedy which does not arise out of a contract and is independent of it.  See Vortt Exploration Co., Inc. v. Chevron U.S.A., 787 S.W.2d 942, 944 (1990)(citing Colbert v. Dallas Joint Stock Land Bank, 129 Tex. 253, 102 S.W.2d 1031, 1034 (1937)).   Recovery  in quantum meruit will be had when non payment for the services rendered would "result in an unjust enrichment to the party benefitted [sic] by the work." Id. (citing City of Ingleside v. Stewart, 554 S.W.2d 939, 942 (Tex. Civ. App.–Corpus Christi 1977, writ ref'd n.r.e.)). To recover under quantum meruit, a claimant must prove that:

14

1) valuable services were rendered or materials furnished;
2) for the person sought to be charged;
3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him;
4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged.

See id.; Bashara v. Baptist Memorial Hospital System, 685 S.W.2d 307, 310 (Tex. 1985). In the instant case, the trial record reveals that Chevron was benefitted by Kona's audits of the Railroads rates awarded to Chevron's competitors. The trial record supports the trial court's finding that "[t]hroughout this controversy and even through the trial of this case, Kona [was] the only company to perform the audit [on] the freight bills of Chevron Chemical under Master Contract 6018 for Section 20 purposes." Additionally, it was reasonable for Chevron to expect that Kona would seek compensation for the auditing services that Kona rendered. Finally, the trial court's judgment in favor of Chevron against the Railroads was predicated on Section 20 violations under Contract 6018. Therefore, the trial court's alternative judgment based on quantum meruit for 50% of Chevron's recovery for Section 20 violations against the Railroads was proper.

III.    Chevron versus the Railroads

Chevron contends that the district court's restrictive interpretation of the Contract 6018 unfairly diminished its damages award. Furthermore, Chevron argues that the district court improperly denied its request for attorneys' fees.

The Railroads maintain the district court erred when it rejected its affirmative defenses of statute of limitations and waiver. Furthermore, the Railroads maintain that the district court improperly granted Chevron's motion to reopen the case to hear additional evidence on damages. The Railroads also argue that the district court's damages award was erroneous and did not comply

15

with Fed.R.Civ.Proc. 52. Finally, the Railroads assert that the district court erred when it denied the Railroads' request for prejudgment interest.

A.    Statute of Limitations

The Railroads argue that Chevron's claim for Section 20 violations which occurred prior to June 24, 1989 were barred by the four-year statute of limitations under Tex.Civ.Prac. & Rem.Code Ann. § 16.0004(a)(3). Specifically, because effective June 24, 1993, Chevron and the Railroads entered into the first of a succession of limitation tolling letters, preserving claims as they existed on June 24, 1993, the Railroads maintain that any claims before June 24, 1989 were time barred. Chevron, however, counters that the discovery rule tolled the statute of limitations because the Sections 20 violations could not have been discovered through the exercise of reasonable diligence prior to 1993.

The district court rejected the Railroads limitations claim on two grounds. First, the district court ruled that the statute of limitations was not applicable because there was a continuing contract. As such, the statute of limitations does not run until the contract is completed or terminated. See Hubble v. Lone Star Contracting, Corp., 883 S.W.2d 379, 382 (Tex. App.–Fort Worth 1994, writ denied); Intermedics, Inc. v. Grady, 683 S.W.2d 842, 845 (Tex.App.–1st Dist. 1984).[4] Contract 6018 was not terminated until April 7, 1994. Therefore, under this theory, the district court asserted that the statute of limitations started to run when the contract was terminated in 1994. In the alternative, the district court ruled that the discovery rule was applicable because Chevron could not

_____

[4] A continuing contract is an agreement where the contemplated performance and payment are divided into several parts, where the work is continuous and indivisible, or the payment for work is made in installments as the work is completed. See Hubble, 883 S.W.2d at 382 (citing Godde v. Wood, 509 S.W.2d 435, 441 (Tex.Civ.App–Corpus Christi 1974, writ ref'd n.r.e)).

16

through the exercise of due diligence discover the Section 20 violations until at the earliest, 1992, when it learned from the Kearney report that the rates the Railroads were charging Chevron were not competitive.

The discovery rule postpones the running of the statute of limitations until such time as the claimant discovers, or in exercising reasonable diligence should have discovered, facts that indicate he has been injured. See Colonial Penn Insurance v. Market Planners Insurance Agency, 157 F.3d 1032, 1034 (5th Cir. 1998)(citing Willis v. Maverick, 760 S.W.2d 642, 643, 6644 (Tex. 1988)). The discovery rule applies to injuries that are inherently undiscoverable, i.e. where the plaintiff did not and could not know of the injury. See id., 157 F.3d at 1034 (citing Velsicol Chemical Corp. v. Winograd, 956 S.W.2d 529, 531 (Tex. 1997)). Thus, the inquiry under the discovery rule is when did the plaintiff "become knowledge[able] of facts which would [have] cause[d] a reasonable person to diligently make inquiry to determine his or her legal rights." Vaught v. Showa Denko K.K., 107 F.3d 1137, 1141-42 (5th Cir. 1997).

In the instant case, the rates that the Railroads were charging Chevron's competitors were confidential. Although Kona had access to the Railroads' rates that they were charging Chevron's competitors for auditing purposes to detect Section 20 violations for Chevron, Kona was contractually obligated to keep Chevron's competitors' rates confidential. Thus, Kona could not reveal to Chevron the information it had acquired through its audits regarding the rates that the Railroad's were charging Chevron's competitors.

The district court below made a factual finding that "Chevron had no reason to suspect it was not receiving the rates required by Section 20 until, at the earliest, March 1992, when Chevron received a report from A.T. Kearney which disclosed that Chevron's rates were basically average

17

among all shippers on all carriers." Based on our review of the voluminous record, the district court's factual finding is not "clearly erroneous" and thus shall remain undisturbed. See Gebreyesus v. F.C. Schaffer & Assoc., Inc., 204 F.3d 639, 642 (5th Cir. 2000)("factual findings are reviewed for clear error").

However, the Railroads point the court to a Texas Supreme Court case that was decided approximately two days after the district court filed its extensive findings of facts and conclusions of law. In HECI Exploration, Co. v. Neel, 982 S.W.2d 881 (Tex. 1998), the court held that the discovery rule was not applicable to a breach of an implied covenant claim based on a lessee's failure to notify the lessor (the "Neels"), who owned royalty interests in a gas lease, that grounds existed to sue the owner of an adjoining gas leasehold interest. In that case, the Neels and an adjoining owner of a gas leasehold shared a common reservoir under their adjoining wells. See HECI, 982 S.W.2d at 884. The lessee sued the adjoining owner for overproduction and obtained a favorable judgment. The Neels sued the lessee four years after the lessee had obtained a release of judgment from the court. The Neels sued the lessee for, *inter alia*, one-fourth of the judgment the lessee obtained from the overproduction suit. See id.

In addressing whether the statute of limitations was applicable, the court concluded that the failure to notify was not an inherently undiscoverable injury because a royalty owner should exercise due diligence to determine whether a common reservoir underlies his leasehold. See id., 982 S.W.2d at 886. Furthermore, the court observed that the records maintained by the Texas Railroad Commission regarding the adjoining lease holder's overproduction provided the Neels constructive notice. See id., 982 S.W.2d. 886-87. As such, the court concluded that the Neels's purported injury

18

regarding the lessee's failure to give notice that reasons existed to sue the adjoining leaseholder was not inherently undiscoverable.

The instant case is distinguishable from HECI. First, information regarding Chevron's competitor's rates were confidential. Furthermore, Chevron's competitors' rates were not accessible through a public or governmental agency. As such, constructive knowledge is not applicable. Also, Chevron's competitors were not obligated to disclose their rates. Thus, making our best "Erie guess" under these circumstances, the district court did not err when it declined to apply the statute of limitations to Chevron's claims.[5]

B.      Waiver

The Railroads contend that Chevron waived its right to enforce Section 20 when it failed to request timely written certification of Section 20 compliance. Specifically, the Railroads argue that Chevron's request for Section 20 compliance was untimely because it was submitted eight months after it had received the Kearney Report. The Railroads also maintain that Chevron's waiver is evidenced by a memo dated November 12, 1992 which suggested that Chevron should bring up the question of past overcharges as leverage to negotiate a lower rate under the successor contract to Contract 6018.

Chevron counters that  the Railroads' duty to provide equal or lower rates than Chevron's competitors was independent of the written certification provision. Furthermore, Chevron contends that the November 1992 memo does not show an intent to relinquish a contractual right.

---

[5] Because we hold that the district court did not err when it declined to apply the statute of limitations based on the discovery rule, we need not address whether the Contract 6018 was a continuing contract. Furthermore, Chevron's claim of fraudulent concealment is rendered moot.

19

Under Texas law, the elements of waiver are: (1) an existing right, benefit, or advantage; (2) actual or constructive notice of the right, benefit, or advantage, and (3) actual intent to relinquish the right, which can be inferred from conduct. See First Interstate Bank v. Interfund Corp., 924 F.2d 588, 595 (5th Cir. 1991) (citing Missouri-Kansas-Texas R.R. Co. v. Heritage Cablevision of Dallas, Inc., 783 S.W.2d 273, 280 (Tex. App.–Dallas 1989, no writ)). Generally, waiver is a fact question of intent. See id. In the instant case, the district court correctly ruled that waiver was not applicable. First, the 1992 memo is not indicative of Chevron's intent to waive its right to prosecute Section 20 violations. Chevron's request for written certification of compliance under Section 20 approximately eight months after the memo was written rebuffs the Railroads' claim that Chevron intended to waive its Section 20 rights . Furthermore, the trial court correctly noted that failure to comply with the written certification provision did not relieve the Railroads' independent affirmative obligation to comply with Section 20.

Although the Railroads argue that Chevron's request was untimely, Section 20 on its face does not set a time period within which to request certification. Section 20 merely states that "[i]n the event Chevron has reason to believe that a competitor has a lower net rate," it shall submit a request for written certification. Thus, whether Chevron's request was timely or not is governed by notions of reasonableness. See Pearcy v. Environmental Conservancy of Austin, Inc., 814 S.W.2d 243, 246 (Tex. App. – Austin 1991, writ denied)("Texas courts have repeatedly held that where a contract does not provide time for performance, the law will imply that performance must occur within a reasonable time"). The 1992 Kearney Report did not list or specify rates that the Railroads were charging Chevron's competitors. In light of the complexities regarding rail rates and tariffs, and the inability of Chevron to obtain its competitors' confidential rail rates, the eight month period

20

between Chevron's acquisition of the 1992 Kearney Report and the date that it requested written certification was not unreasonable.

C.    Chevron's Motion to Reopen

The Railroads contend that the district court erred when it granted Chevron's motion to reopen the record to present additional evidence on damages. Specifically, the Railroads contend that Chevron improperly offered the testimony of an expert on damages months after the case was submitted to the court for determination. The Railroads also contend that Chevron could have presented the testimony at trial, but chose not to do so. The Railroads argue that Chevron wanted to "wait and see" how the court would interpret the contract before deciding whether to call the additional witness. Thus, the Railroads maintain that the district court improperly permitted Chevron to get a "second bite at the apple" on the damages issue.

A court's decision to reopen a case "will not be disturbed in the absence of a showing that it has worked an injustice." Garcia v. Woman's Hospital of Texas, 97 F.3d 810, 814 (5th Cir. 1996). The factors the trial court should consider are: (1) the importance and probative value of the additional evidence; (2) the reason's for the moving party's failure to introduce the evidence at trial; and (3) the possibility of prejudice to the non-moving party. Id.

Our review of the district court's hearing regarding its order to reopen the case reveals that the trial court carefully considered the request before it and expressly limited the additional evidence to damages. The bench trial below involved a voluminous document intensive record, complex issues, and multiple claims for millions of dollars in damages presented by multiple parties. Under these circumstances, we cannot conclude that the trial court's ruling to allow additional evidence on damages amounted to an abuse of discretion. Furthermore, the hearing transcript reveals that the

21

district court permitted both parties additional time for discovery, and placed parameters on the direct and cross examination of the additional witness. Thus, the district court's efforts to limit the scope of inquiry, to provide additional time for discovery, and to place parameters on the additional proceeding minimized any apparent prejudice incurred by the Railroads. As such, the Railroads do not establish that the district court's ruling to reopen "worked an injustice." See Garcia, 97 F.3d at 814.

D.      Contract Interpretation and Damages Calculations

Chevron argues that the district court's narrow contract interpretation unfairly limited its damages. The Railroads maintain that the district court's damages calculations did not comply with Rule 52.

1.      District Court's Interpretation of the Contract

Contract interpretation is a question of law which we review de novo. Fina, Inc. v. Arco, 200 F.3d 266, 268 (5th Cir. 2000).

Chevron's challenge to the district court's interpretation of the shipping contract involves two major points of contention: (1) the proper meaning of "same or related origins and same or related destinations," and (2) the "merger doctrine." We address each in turn.

a.      Same or Related Origins and Destinations.

Section 20 of Contract 6018 provides:

> During the term of this Contract, Carriers shall provide Chevron with net rail contract rates that are equal or lower than net rates of competitors of Chevron with respect to the movement of same commodities [] from same or related origins to same or related destinations as included in addendums to this contract. In the event Chevron has reason to believe that a competitor has a lower net rate or minimum weight, then Chevron will notify carriers in writing and

22

request carriers to certify in writing that Chevron has the equivalent lower contract net rate.

(emphasis added).   As the district court stated below: "This term (same or related  origins to same or related destinations) is significant in that it determines which of the thousands of shipments of plastic resins on the Railroads' lines each year were to be compared to shipments by Chevron for the purpose of determining if Chevron received equivalent or lower net rates as provided in Section 20." Thus, Chevron's damages were contingent on the court's interpretation of this provision.  The more liberal the interpretation, the higher the recovery.  Conversely, the more conservative or restrictive the interpretation, the lower the recovery for Chevron.

The district court construed "related origins" and "related destinations" to mean points that are rail stations described in tariffs and that are related in the groups described in the National Rate Basis Tariff (the "NRBT").  For example, "origin A" and all points that take the same rates as "origin A" are "related origins."  Thus, "origin B" and all points that take the same rates as "origin B" are "related origins" that constitute another set of "related origins" different from "origin A."  In reaching this conclusion, the district court relied on expert testimony proffered by the Railroads.  The district court also reviewed industry treatises and published Interstate Commerce Commission rulings interpreting similar terms.

Chevron apparently argues that the same or related origins and destination language should be interpreted based on geography.  Specifically, Chevron appears to argue that shipments of plastic resins in the  "Gulf coast" region should be the geographic base to compare the rates that the Railroads charged Chevron's competitors.  Furthermore, Chevron asserts that if the parties intended

for the NRBT to govern the standards to determine same or related origins and destination, the parties would have expressly referred to the NRBT in the agreement.

When interpreting an agreement, courts strive to give effect to the parties' intent. Borders v. KRLB, Inc., 727 S.W.2d 357, 359 (Tex. App. – Amarillo 1987, writ ref'd n.r.e.). The parties intent is gleaned from the entire agreement, and thus Texas law requires us to "peruse the complete document to understand, harmonize, and effectuate all its provisions." Questa Energy Corp. v. Vantage Point Energy, Inc., 887 S.W.2d 217, 221 (Tex. App.-- Amarillo 1994, writ denied).

Our de novo review supports the district court's conclusion. First, the term "same or related origins to same or related destination" does not on its face use geography as the mediating principle to determine which groups of origins or destinations are to be used to identify Section 20 violations. Furthermore, Chevron does not identify any provision or language in the agreement that states origins or destinations in the Gulf coast region shall exclusively be used to identify Section 20 violations.

However, Section 24 of the Contract 6018 provides that:

> Shipments made under the provision of this Agreement are subject to <u>AAR (American Association of Railroads) rules and other accepted practices within the industry</u> as the same may be amended from time to time. Services and other matters not specifically addressed in this Agreement shall continue to be governed by and paid for under the rules, regulations, tariffs, and statutes as described above which would apply if the transportation service were provided under tariffs.

(emphasis and parenthetical added). Thus, Section 24 expressly defers to industry standards and customs, and rules and regulations. The district court heard testimony from Chevron witnesses Rusty Radloff ("Radloff") and Clifford Sayre ("Sayre"). Radloff was the principal contract negotiator for the Railroads. Sayre, who was called as an expert witness by the Railroads, was a former

24

transportation consultant and former vice president of DuPont's materials, logistics and services, with responsibility for its transportation division. At the time of trial, Sayre had approximately 40 years in the plastics industry. Essentially, both Sayre and Radloff testified that the same or related origin and destination language had a specialized meaning in the industry. Sayre testified that the language as understood in the industry refers to rail stations described in tariffs and that are related in groups described in the NRBT. Radloff testified that "same or related origins" refers to groupings of various stations in published tariffs that take the same rate basis.

Furthermore, as stated above, ICC rulings support the district court's interpretation. See Hoerner Waldorf Corp. v. Union Pacific RR Co., 358 ICC 1, 10 (1977)("the practice of grouping points of origin or destination and applying the same rate to all points with the group is a longstanding characteristic of the rate structure of the country."); Docket 28300, Class Rate Investigation, 262 I.C.C. 447 (1945)("Points other than key points in areas of the respective territories accorded key rates are embraced in congruous key points so as to compose logical and natural groupings"). The district court's conclusion is also consistent with treatises covering the subject matter. See Transportation and Logistic Dictionary, (1989)("A number of points , the rates from which are made the same as or with relation to rates from other points in the same group"); Harry Bruce, Distribution and Transpiration Handbook, (1971)("A group of points, the rates to which are made the same as or with relation to rates to other points in the group").

Although Chevron argues that the district court erred by relying on Radloff's and Sayre's testimony and the treatises, we have recognized that a trial court's reliance on individuals experienced in a particular field for the purposes of obtaining explanation of the technical meaning of terms used in the industry is "prudent." See Phillips Oil Co. v. O.C., Corp., 812 F.2d 265, 281 (5th Cir. 1987).

"In construing a specific contractual term, we must give consideration to the meaning attributed to that term in the industry." Personal Preference Video, Inc. v. HBO, 986 F.2d 110, 114 (5th Cir. 1993). Additionally, we reject Chevron's challenge to Sayre's testimony under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589-90, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), because Sayre's credentials adduced at trial establish that he was qualified to render expert testimony. We will not upset a district court decision to rely on expert testimony absent a showing of abuse of discretion. See Moore v. Ashland Chemical Inc., 151 F.3d 269, 274 (5th Cir.1998) (en banc) (citing General Electric Co. v. Joiner, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). Chevron does not show that the district court abused its discretion.

Therefore, based on our review of the agreement and the pertinent portions of the record, we agree with the district court's interpretation of "same or related origins to same or related destinations."[6]

### b. Merger Doctrine

Chevron claims that the district court improperly applied the merger doctrine and ruled that the favored nations clause in Section 20 of Contract 6018 was not applicable to any of the Connecting Carrier Contracts or shipments. Thus, under the district court's ruling, shipments made under the Connecting Carrier Contracts could not be used to identify Section 20 violations. This had the effect of limiting the amount of damages Chevron could claim.

Contract 6018 provided that:

---

[6]Chevron asserts other claims regarding impeachment, parole evidence, and credibility. However, a review of these claims shows that the court's rulings did not implicate a substantial right. See Fed.R.Evid. 103(a)(error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected).

26

> Chevron and Carriers are in the process of negotiating through rates (Base Rates) and until such through rates are agreed upon and are included in the Agreement or other Agreements to which Chevron and Carriers are party (with or without additional carrier), the published tariff rates will apply, less refund allowances shown in the attached addendums.

Some of the through rates included "interline shipments." Interline shipments involved shipments to destinations that were not covered under the Railroads' lines. As such, connecting carriers were used to transport products from the Railroads lines to destinations on the connecting carriers' lines. Consequently, separate shipping agreements with the individual connecting carriers were negotiated to provide connecting services. Thus, the question before us is whether Section 20 of Contract 6018 applied to the separate and subsequent Connecting Carrier contracts.

The district court applied the merger doctrine and ruled that the subsequent Connecting Carrier contracts did not incorporate Section 20 of the Contract 6018. The "merger doctrine" is an analogue of the parol evidence rule. Merger refers to the absorption of one contract into another subsequent contract and is largely a matter of the intention of the parties. See Pittman v. Lightfoot, 937 S.W.2d 496, 529 (Tex. App. – San Antonio 1996, no writ): Leon Ltd. v. Albuquerque Commons Partnership, 862 S.W.2d 693, 701 (Tex. App. –El Paso, 1993, no writ). Before one contract is merged into another, the subsequent contract must: (1) be between the same parties as the first; (2) embrace the same subject matter; and (3) must have been so intended by the parties. See Albuquerque, 862 S.W.2d at 700; Smith v. Smith, 794 S.W.2d 823, 827 (Tex. App. –Dallas 1990, no writ).

Regarding the first element, both Contract 6018 and Connecting Carrier Contracts were essentially between the same parties because Contract 6018 contemplated that the connecting carriers

27

would become a part of Contract 6018. Although the Connecting Carriers were additional parties, this does not impact our analysis because the merger doctrine is not sought to be applied to the Connecting Carriers. As to the second factor, both contracts involve through rates for shipments between the Railroads and other Carriers. Finally, the terms of Contract 6018 contemplate subsequent contracts with Connecting Carriers. As such, because the subsequent contracts with the Connecting Carriers that covered through rates did not provide for Section 20 violations, Section 20 does not apply to the Connecting Carriers Contract.

### 2. Federal Rule of Civil Procedure 52

The Railroads argue that the district court erred under Rule 52 when it made its damages calculations. Specifically, the Railroad argues that the district court improperly relied on the damages calculations provided by Chevron's expert Thomas D. Crowley ("Crowley") because his calculations exceeded the scope of the district court's preliminary findings of fact and conclusions of law. Furthermore, the Railroads maintain that the district court failed to comply with Rule 52 by failing to state with the requisite specificity the grounds for its damages award.

Under Rule 52, "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous." Furthermore, "[w]here the court's finding is based on its decision to credit the testimony of one witness over that of another, that finding, if not internally inconsistent, can virtually never be clear error." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

The district court awarded principal damages of $9,951,642.00 to Chevron for the Railroads' Section 20 violations. The district court in reaching its damages calculations pursuant to its preliminary findings of fact and conclusions of law concluded that Chevron's calculations are more

28

consistent with the evidence. Crowley was Chevron's chief witness regarding damages calculations. As such, the district court necessarily chose to credit Crowley's calculations over the Railroads' calculations.

The Railroads mainly contend that Crowley's calculations were erroneous because they were based on multiple NRBT groups as opposed to one grouping. Additionally, the Railroads argue that Crowley applied the wrong NRBT group origins.

In reviewing this issue, we are mindful that clear error is a highly deferential standard. Our review of the district court's preliminary finding does not evidence a prohibition against the methodology that Crowley used to arrive at his calculations. Furthermore, Contract 6018 does not proscribe a specific method to calculate overcharges incurred vis a vis Section 20 violations. As such, the Railroads fail to show that the district court committed clear error when it relied on Crowley's calculations to render its damages award.

Moreover, in light of the district court's extensive 53-page Findings of Fact and Conclusions of Law, we reject the Railroads' contention that the district court failed to state the basis for its judgment with the requisite specificity. Even if a trial judge fails to make a specific finding on a particular fact, the reviewing court may assume that the court impliedly made a finding consistent with its general holding so long as the implied finding is supported by the evidence. In re Texas Mortgage Service Corp., 761 F.2d 1068, 1075 n. 12 (5th Cir.1985); Gilbert v. Sterrett, 509 F.2d 1389, 1393 (5th Cir.), cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). As such, we will not disturb the district court's damages award.

E.      Prejudgment Interest

The Railroads contend that the district court erred when it denied their request for prejudgment interest for the $282,959.00 that Chevron stipulated in a settlement agreement that it owed the Railroads for erroneous overcharge payments.

Prejudgment interest is compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of *judgment*. See Johnson & Higgins of Tex. Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507 (Tex. 1998). Under Texas law, there are two legal sources for an award of prejudgment interest: (1) general principle of equity, and (2) an enabling statute. See id.; Canvar v. Quality Control Parking, Inc., 969 S.W.2d 549, 552 (Tex. 1985); Phillips Petroleum Co. v. Stahl Petroleum Co., 569 S.W. 2d 480, 483-85 (Tex. 1978). We review a district court's denial of prejudgment interest for abuse of discretion. See Ensly v. Cody Resources, Inc., 171 F.3d 315, 321 n.14 (5th Cir. 1999); see also Purcell Constr. v. Welch, 17 S.W.3d 398, 402 (Tex. App.-- Houston [1st Dist.] 2000)("[w]e review a challenge to a trial court's award of pre-judgment interest using an abuse of discretion standard, giving limited deference to the court's application of the law to the facts").

The Railroads do not point to an enabling statute. Thus, the only ground available to the Railroads for prejudgment interest must be found in equity. The Railroads merely make a conclusory claim that they are entitled to prejudgment interest. They do not assert that the district court abused its discretion, nor do they put forth reasons or grounds that would warrant the district court to exercise its equitable powers to award prejudgment interest. Under these circumstances, the Railroads do not show that the district court's denial of their request for prejudgment interest amounted to an abuse of discretion.

F.     Attorneys' fees

30

Chevron claims that the district court erred when it denied its request for reasonable attorneys fees. The district court reasoned that because "both parties [] prevailed and failed on certain legal and factual issues" an award of "attorneys' fees and costs to either side would not be equitable or just."

"The award of attorneys' fees is governed by the law of the state whose substantive law is applied to the underlying claims." Exxon, Corp v. Burglin, 4 F.3d 1294, 1301 (5th Cir. 1993)(citing Kucel v. Walter E. Heller & Co., 813 F.2d 67, 73 (5th Cir. 1987)). Under Texas law, when a prevailing party in a breach of contract suit seeks attorneys' fees, an award of reasonable fees is mandatory under Tex. Civ. Prac. & Rem.Code Ann. § 38.001(8). See World Help v. Leisure Lifestyles, 997 S.W.2d 662, 683 (Tex. App.–Fort Worth, 1998); Atlantic Richfield Co. v. Long Trusts, 860 S.W.2d 439, 449 (Tex. App.–Texarkana 1993, writ denied). Thus, to obtain an award of attorneys' fees under section 38.001, a party must meet two requirements: (1) it must prevail on a cause of action for which attorneys' fees are recoverable, and (2) it must recover damages. See Green Intern. Inc. v. Solis, 951 S.W.2d 384, 389 (Tex.1997); Kenneth Leventhal & Co. v. Reeves, 978 S.W.2d 253, 257 (Tex.App.--Houston [14th Dist.] 1998, no pet.). When a claim under section 38.001 is successful, a trial court has the discretion to determine the proper amount of attorneys' fees. Additionally, when a claim is successful, and reasonable fees are proven, a trial court has no discretion to deny the fees. See World Help v. Leisure Lifestyles, Inc., 977 S.W.2d 662, 683 (Tex.App.-- Fort Worth 1998, pet. denied); Cortland Line Co., Inc. v. Israel, 874 S.W.2d 178, 184 (Tex.App.--Houston [14th Dist.] 1994, writ denied).

31

In the instant case, Chevron prevailed on its contractual claim based on the Railroads' breach of Section 20.  Furthermore, the district court awarded damages based on the Railroads' breach.  The record also evidences Chevron's presentment of a claim for attorney's fees to the district court.

The fact that Chevron may not have prevailed on all of its legal and factual claims does not act as a per se  bar to attorneys' fees  because Chevron prevailed and received damages on its contract claim.  The district court did not find that Chevron's request was unreasonable.  As such, the district court abused its discretion by denying Chevron's request for attorneys' fees.  Therefore, we remand to the district court with instructions to apply the factors set forth in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir., 1974).[7]

## Conclusion

We AFFIRM the district court's rulings and judgment below in all respects except the district court's denial of Chevron's request for attorneys' fees.  We VACATE the denial of Chevron's requests for attorneys' fees and REMAND for proceedings consistent with this opinion.

---

[7] The Texas Supreme Court has recently outlined factors comparable to those in Johnson. Cf. Arthur Anderson & Co. v. Perry Equip. Corp., 945 S.W. 2d 812, 818 (Tex. 1997)((1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;   (2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services;   (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances;   (6) the nature and length of the professional relationship with the client;   (7) the experience, reputation, and ability of the lawyer or lawyers performing the services;  and   (8) whether the fee is fixed or contingent on results obtained or uncertainty).  Furthermore, we have obviated the need to determine whether the Johnson factors apply in Texas diversity cases because Texas court's have engaged in a similar analysis to determine the reasonableness of attorneys' fees.  See Mid-Continental Casualty Co. v. Chevron Pipeline Co., 205 F.3d 222, 232 (5th Cir. 2000).

32

.