IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 02-10874
Summary Calendar

CHENG HOA BAKER,

Plaintiff - Appellant,

versus

THE WATERFORD SQUARE HOMEOWNERS ASSOCIATION; MARK LILLARD
RANDLES,

Defendants - Appellees.

Appeals from the United States District Court
for the Northern District of Texas
(00-CV-1348)

January 6, 2003

Before HIGGINBOTHAM, SMITH, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

   Appellant Cheng Hoa Baker appeals the district court's bench trial ruling dismissing all of her

claims against her homeowner's association and one of its officers. Relevant for appeal are Baker's

claims for discrimination under the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq*., and 42

   [*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

1

U.S.C. §§ 1981 and 1982, and a state tort claim for intentional infliction of emotion distress. Finding no error, we affirm.

## I. FACTS AND PROCEEDINGS

At all relevant times, Cheng Hoa Baker lived alone, save for her pets, in two units of the Waterford Square Condominium complex in Dallas, Texas. She owned three other units, which she leased to tenants. Appellee Mark Randles owned the largest share of the condominiums (around 20%), and was an officer of the homeowner's association ("Waterford"), also an appellee.

Baker, of Chinese ancestry, emigrated to the United States from Thailand in 1981 and married Royce Baker in 1983. The couple moved into the Waterford complex in 1984, and eventually acquired ownership of five units. Royce Baker died in 1993. Baker brought this lawsuit in 2000 alleging that immediately following her husband's death, Randles and Waterford engaged in a pattern of harassment, culminating in an attempt to force her to consent to selling her units.

Baker and her husband had never received any complaints in their nine years at the complex, but soon after Mr. Baker's death, Randles, who had previously ignored Baker, demanded that Baker get rid of her eight dogs. Randles told Baker she "live[s] with dogs, sleep[s] with dogs, [and] stink[s] like a dog," and threatened to make her life a "living hell" if she did not get rid of her dogs. A Waterford official later told her to get rid of at least four dogs.

Beginning in 1994 Waterford notified Baker in writing on several occasions of various resident complaints regarding: the odor and noise from her dogs; Baker's habit of feeding stray cats; the amount of traffic and the noise from one of Baker's rental apartments; and suspicious activity occurring in that rental apartment. Waterford also notified Baker of various violations of the condominium by-laws, including: unclean patios; a missing divider wall between the patios of Baker's

2

two units; overcrowding in one of Baker's rental apartments; broken screen doors; poorly-kept mini-blinds; a barbeque pit on Baker's patio; a sign posted on Baker's window; and an inadequate front door.

In October 1994, Waterford attempted to perform patio maintenance on Baker's unit, and when she angrily confronted the maintenance worker, he pushed her away, prompting Baker called the police.

Waterford began assessing fines against Baker and her tenants. When Baker refused to pay, Waterford threatened, in August 1995, to instigate non-judicial foreclosure proceedings. Waterford never initiated such proceedings, and Baker eventually paid $ 450 worth of fines in 1999.

During this period, Waterford called the Dallas animal control authorities on several occasions to inspect Baker's apartment but never gave her a citation. According to Baker, Waterford officials also made it difficult for her tenants to receive parking permits.

Jimmy Shelton, a former Randles tenant who moved into one of Baker's units, testified that Randles told him he (Shelton) would "suffer for what [Baker has] done," and referred to Baker as a "bitch." Shelton also testified, "Almost every time I went to go pay the rent [Randles] wanted me to sign something saying the dogs were a problem when they weren't." Thomas Moore, a porter who worked at the complex in 1994 and 1995 testified that Randles often uttered offensive slurs regarding Mexican-Americans, African-Americans and homosexuals. Moore also testified that Randles once commented that Baker kept so many dogs "because those kind of people eat 'em." Baker testified that in 1997 Randles made barking noises at her and repeated his familiar line: "you smell like a dog, or sleep with [a] dog, [and] eat with [a] dog."

In 1999, a buyer proposed to purchase all the Waterford units, but only if all the owners agreed

3

to sell. When Baker and one other owner refused to sell, Waterford sought legal advice on whether it could force the holdouts to sell. In a June 1999 letter, Waterford's counsel advised that, absent substantial condemnation or destruction of the property, holdout owners could not be forced to sell.

Apparently undeterred by their lawyer's advice, Waterford assessed Baker a fine of $2 per square foot—totaling $ 6,750—for refusing to consent to sell. In January 2000, Waterford threatened Baker that if she continued to resist, Waterford would disconnect her utilities and bar her tenants from the common areas, such as the laundry room, parking lot and swimming pool. Baker filed this lawsuit against Waterford in Texas state court January 31, 2000, and added Randles as a defendant October 2, 2000. In February 2000, Waterford assessed Baker her portion of a $ 25,000 "legal fund" purportedly to be used in connection with the proposed sale of Waterford. The fund was used only to defend this lawsuit.

The Texas state court issued a temporary restraining order against Waterford, enjoining it from (1) interfering with Baker's utilities; (2) interfering with her, or her tenant's, access to common areas and parking, and (3) from imposing any penalties in connection with Baker's refusal to sell. After removal, the federal district court entered a substantially similar temporary restraining order, but also enjoined Waterford from "threatening, assaulting or in any way attempting to harm" Baker or her tenants. The district court, after a hearing, issued a substantially similar preliminary injunction August 21, 2000. The district court conducted a bench trial July 1, 2002 and at the close of Baker's case, granted defendant's motion for judgment under Federal Rule of Civil Procedure 52(c).

The district court ruled against Baker on her FHA, § 1981, and § 1982 claims because it found that Waterford's actions were not based on Baker's race, national origin, or sex. *Baker v. Waterford*, No. Civ.A.3:00-CV-0354-D, 2002 WL 1461735, at *3 (N.D. Tex. July 2, 2002). The district court

ruled against Baker's claim of intentional infliction of emotional distress because it found that Baker had failed to show that defendants' conduct was extreme or outrageous. *Id*. at *4. In the alternative, the district court found that Baker failed to show she suffered severe emotional distress. *Id*. at *4-*5. The district court also made the general observation that much of Baker's evidence was time-barred under the two-year statute of limitations. *Id*. at *6.

## II. STANDARD OF REVIEW

When the district court grants a Rule 52 motion, this Court will not set aside the district court's findings of fact unless "clearly erroneous," and "due regard" will be given to its credibility determinations. FED. R. CIV. P. 52(a). Conclusions of law are reviewed de novo. *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 601 (5th Cir. 2000).

## III. DISCUSSION

A. Fair Housing Act and §§ 1981 and 1982

The district court characterized Baker's broadly-worded FHA complaint as alleging that defendants created a hostile housing environment in violation of the FHA's anti-discrimination provision, 42 U.S.C. § 3604(b). *Baker*, 2002 WL 1461735, at *3. Baker does not challenge that characterization on appeal. The Supreme Court has recognized "hostile environment" sex discrimination claims as actionable under Title VII, *see Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 63 (1986), and by analogy, courts of appeal have recognized "hostile housing environment" claims under the FHA. *See DiCenso v. Cisneros*, 96 F.3d 1004, 1008 (7th Cir. 1996); *Honce v. Vigil*, 1 F.3d 1085, 1090 (10th Cir. 1993). This Court has yet to address the issue.

Assuming the FHA provides relief for hostile housing environment claims, Baker would have to show, among other things, discrimination based on either race, national origin, or sex. *See* 42 U.S.C.

5

§ 3604(b); *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) (Title VII hostile work environment and race discrimination); *Waymire v. Harris County, Tex.*, 86 F.3d 424, 428 (5th Cir. 1996) (Title VII hostile work environment and sex discrimination). Her claims under §§ 1981 and 1982 require her to show, among other things, intentional racial discrimination. *See Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 751 (5th Cir. 2001) (§ 1981); *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986) (§ 1982). Because the district court's finding that defendants' conduct was not based on race, national origin, or sex was not clearly erroneous, these claims fail.

Apart from the stray, offensive remarks Randles made between 1993 and 2000, it is difficult to discern from Baker's brief how the defendants' conduct—reprehensible if true—is connected to race, national origin, or sex. As best the Court can determine, Baker's theory is as follows: (1) When Baker was married, she encountered no problems with Waterford or Randles; (2) when Mr. Baker died, the problems surfaced immediately and acutely; and therefore, (3) the harassment must have been attributable to the fact that Baker, unlike her husband, is an Asian woman. Baker suggests that she would never have been harassed had Mr. Baker, a retired Army veteran, been alive.

Even assuming the soundness of Baker's theory, it is directly in conflict with the district court's findings.

> [Waterford] believed that her conduct violated Waterford's Bylaws, and it assessed fines on that basis, not based on her race, national origin, and/or sex. When Waterford threatened penalties (including cutting off her utilities and depriving her of access to common areas) based on her failure to consent to the sale of Waterford Square, it did so because she failed to consent. Regardless whether this conduct was unlawful in some other respect, it was not based on her race, national origin, and/or sex. And although the evidence shows that Randles made some stray remarks that reflect regrettable insensitivity to women and minorities, the court is persuaded by the evidence as a whole that Randles' conduct toward Baker was based on his profound disagreement with the manner in which she maintained her units and conducted herself concerning her dogs and stray cats, not on her race, national origin, and/or sex. At bottom, this is a dispute about the exercise of property rights, not unlawful

6

discrimination under federal law.

*Baker*, 2002 WL 1461735, at *3. In other words, the district court was not persuaded by Baker's theory that Waterford's conduct was motivated by discrimination. Considering the volume of complaints and the scarce evidence of a discriminatory motive, the district court's findings on this point were not clearly erroneous. The district court was correct to conclude that, "At bottom, this is a dispute about the exercise of property rights, not unlawful discrimination under federal law." *Id.* at *3.

B. Intentional Infliction of Emotional Distress

To prevail on a claim for intentional infliction of emotional distress, Baker must show that (1) defendants acted intentionally or recklessly; (2) their conduct was extreme and outrageous; (3) their actions caused Baker emotional distress; and (4) her emotional distress was severe. *See Texas Farm Bureau Mutual Ins. Co. v. Sears*, 84 S.W.3d 604, 610 (Tex. 2002). "To be extreme and outrageous, conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 611 (Tex. 1999) (quoting *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex. 1995)). "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not rise to the level of extreme and outrageous conduct." *Id.* at 612.

The district court found that

Baker did not prove by a preponderance of the evidence that either defendant engaged in conduct that was extreme and outrageous. At most, she proved that defendants attempted over a period of several years to enforce the Waterford Square bylaws in response to complaints of co-owners and tenants; that Waterford acted in the face of a contrary legal opinion when it fined and assessed her, and threatened to cut off her utilities and those of her

7

tenants, following her refusal to sell her units in Waterford Square; and that defendants engaged in insults, indignities, threats, annoyances, petty oppressions, or other trivialities that do not rise to the level of extreme and outrageous conduct.

*Baker*, 2002 WL 1461735, at *4. The district court's finding was not clearly erroneous. *Cf. Bruce*, 998 S.W.2d at 613 (holding it extreme and outrageous conduct where employer, over two years, "engaged in a pattern of grossly abusive, threatening, and degrading conduct" and "repeatedly physically and verbally threatened and terrorized [his employees].").

## IV. CONCLUSION

For the stated reasons, the judgment of the district court is affirmed.