**G. Craig HUBBLE, Trustee,**

v.

**LONE STAR CONTRACTING CORPORATION.**

No. 2–93–264–CV.

Court of Appeals of Texas, Fort Worth.

Aug. 23, 1994.

Rehearing Overruled Oct. 11, 1994.

G. Craig Hubble, pro se.

Richard G. Dafoe, Steven A. Hollis, Vial, Hamilton, Koch & Knox, Dallas, for appellee.

Before FARRIS, LATTIMORE and DAY, JJ.

## OPINION

LATTIMORE, Justice.

Appellant G. Craig Hubble, Trustee ("Hubble"), appeals from a judgment in favor of appellee Lone Star Contracting Corp. ("Lone Star") in which the trial court foreclosed Lone Star's mechanic's and material-men's lien on a three-acre tract (the "Property") owned by Hubble. On appeal Hubble raises three points of error contending that the trial court erred: (1) in granting judgment foreclosing Lone Star's lien on the Property because the lien is barred by limitations; (2) in failing to find that Lone Star's cause of action accrued for limitations purposes more than four years before the filing date of this suit; and (3) in failing to grant Hubble a declaratory judgment that Lone Star's lien was extinguished because the limitations period had run.

We affirm.

Lone Star is an earth moving contractor. Starting in 1983, Lone Star began work on a large contract at the south end of Lake Arlington known as the Enchanted Bays project. Though the work was done under one contract, it involved six different sections of land, each owned by a different partnership. All of the work involved in this suit was done on section six, which was owned by a partnership known as Park Lake Joint Venture ("Park Lake"). The agreement between Lone Star and Park Lake provided for monthly progress draws based on work actually performed during the preceding calendar month on estimates certified by the project engineer. The contract provided that five percent of each progress draw would be retained by the owner until the contract was completed. After about three years of work, Park Lake failed to pay four monthly progress draws that were due and payable on March 10, 1986, April 10, 1986, June 10, 1986, and September 10, 1986. To protect its interests, Lone Star filed its lien affidavit on November 3, 1986. The lien was filed on all six sections of the project for a total claimed sum of $1,590,507.57, of which Lone Star attributed $108,632.01 to section six.

Charles G. Starnes and Associates, Inc. ("Starnes") was the engineer on the Enchanted Bays project. When Starnes was not paid for its services, it filed a lien on section six of Enchanted Bays. Subsequently, Starnes filed suit against Park Lake to foreclose its lien and obtained a judgment ordering foreclosure of the lien on a three-acre tract (the "Property") located within

section six. At the sheriff's sale, the Property was purchased by Hubble. Starnes did not notify Lone Star of its foreclosure, even though Lone Star had a lien on the Property. On October 31, 1990, Lone Star filed suit against Hubble, seeking foreclosure of its lien on that portion of section six owned by Hubble, and against Park Lake, seeking recovery of the sums due Lone Star by Park Lake. Hubble defended the action by asserting that Lone Star's claim was barred by the four-year statute of limitations. Hubble also sought a declaratory judgment that Lone Star's lien on his property was extinguished by expiration of the limitations period. Park Lake filed for bankruptcy protection and did not participate in the trial of this case.

In the contract, Lone Star was referred to as "Contractor" and the landowners, including Park Lake, were referred to as "Owner." Paragraph 4.10 of the contract states:

> The Contract will be considered as having been fulfilled, save as provided in any bond or bonds or by law, when all the work and all sections or parts of the project covered by the Contract Documents have been finished and completed, the final inspection made by the Engineer, and final acceptance and final payment made by the Owner.

Paragraph 9.9 of the Contract provides for a final estimate and final payment when all work was finished and the Contract was complete. At completion the project engineer was to prepare a certificate of completion and final estimate of the work performed, which the Owner was to pay within thirty days. Paragraph 9.9 also provides that "[a]ll prior estimates upon which partial payment has been made are subject to necessary corrections or revisions on the final estimate." Paragraph 4.8 addresses a situation where the Owner defaults before completion of the Contract:

> In case the Owner shall fail to comply with the terms of this Contract and should fail or refuse to comply with said terms within ten (10) days after written notification by

the Contractor, then the Contractor may suspend or wholly abandon the work and may remove therefrom all machinery, tools, and equipment and all materials on the project that have not been included in payments to the Contractor and have not been wrought into the work. And thereupon, the Engineer shall make an estimate of the total amount earned by the Contractor, which estimate shall include the value of all of the work actually completed by said Contractor at the prices stated in the attached Proposal, the value of all partially completed work at a fair and equitable price, and the amount of all extra work performed at the prices agreed upon or provided for by the terms of this Contract, and a reasonable sum to cover the cost of any provisions made by the Contractor to carry the whole work to completion, and which cannot be utilized. The Engineer shall then make a final statement of the balance due the Contractor by deducting from the above estimate all previous payments by the Owner and all other sums that may be retained by the Owner under the terms of this Agreement and shall certify same to the Owner who shall pay to the Contractor, on or before thirty (30) days after the notification by the Contractor, the balance shown by said final statement as due the Contractor under the terms of this Agreement.

■■■ A statutory mechanic's lien is only an incident to the debt, and there can be no judicial foreclosure of the lien if the debt is barred by limitations. *Holcroft v. Wheatley*, 112 S.W.2d 298, 299 (Tex.Civ.App.—Amarillo 1937, writ dism'd). The applicable limitations period for an action on a debt contracted before September 1, 1989 is four years.[1] TEX.CIV.PRAC. & REM.CODE ANN. § 16.004 (Vernon 1986). Typically, construction is performed under a continuing contract. In a continuing contract, the contemplated performance and payment is divided into several parts or, where the work is continuous and indivisible, the payment for work is made in installments as the work is completed.

---

1. The legislature has adopted TEX.PROP.CODE ANN. § 53.158 (Vernon Supp.1994), which provides for a two-year limitations period for filing suit to foreclose on a lien for contracts entered into after the effective date of the statute, September 1, 1989.

*Godde v. Wood,* 509 S.W.2d 435, 441 (Tex. Civ.App.—Corpus Christi 1974, writ ref'd n.r.e.); *City and County of Dallas Levee Improvement Dist. v. Halsey, Stuart & Co., Inc.,* 202 S.W.2d 957, 961 (Tex.Civ.App.— Amarillo 1947, no writ). Thus, a construction contract continues until the work is completed by the contractor, with periodic progress payments made by the owner to the contractor based on estimates of the value of work completed in each period. *Godde,* 509 S.W.2d at 441. Limitations begins to run on a continuing contract at the earlier of the following: (1) when the work is completed; (2) when the contract is terminated in accordance with its terms; or (3) when the contract is anticipatorily repudiated by one party and this repudiation is adopted by the other party. *Id.; Halsey,* 202 S.W.2d at 961; *Leonard v. Kendall,* 190 S.W. 786, 788 (Tex. Civ.App.—Dallas 1916, writ ref'd). Repudiation is conduct which shows a *fixed* intention to abandon, renounce, and refuse to perform the contract. *Continental Casualty Co. v. Boerger,* 389 S.W.2d 566, 568 (Tex.Civ.App.— Waco 1965, writ dism'd).

▮▮▮ The disposition of Hubble's three points of error may be resolved by answering a single question: When did the cause of action on the debt accrue for limitation purposes? The trial court made very specific findings of fact supporting its conclusion that limitations had not run when the suit was filed on October 31, 1990. Findings of fact entered in a case tried to the court are of the same force and dignity as a jury's verdict. *City of Clute v. City of Lake Jackson,* 559 S.W.2d 391, 395 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards as are applied in reviewing the legal or factual sufficiency of the evidence supporting a jury's answer. *Okon v. Levy,* 612 S.W.2d 938, 941 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.); *First Nat'l Bank v. Kinabrew,* 589 S.W.2d 137, 146 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.). In reviewing a point of error asserting that a finding is "against the great weight and preponderance" of the evidence, we must consider and weigh all of the evidence, both the evidence that tends to

prove the existence of a vital fact as well as evidence that tends to disprove its existence. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986); *Ford Motor Co. v. Nowak,* 638 S.W.2d 582, 585 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.). So considering the evidence, if a court's finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained, regardless of whether there is some evidence to support it. *Watson v. Prewitt,* 159 Tex. 305, 320 S.W.2d 815, 816 (1959); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

Here, it is clear that all of the work contemplated by the contract was not completed. Nor is there any evidence that the contract was terminated in accordance with its terms, since there was no written notice of termination by either party, and a final billing statement was not prepared by the project engineer. All parties agree the Owner partially breached the contract by failing to make progress payments on four payment requests submitted by the Contractor and Engineer to the Owner. The remaining questions are whether this breach was a repudiation by the Owner, and if so, whether the Contractor adopted the Owner's repudiation before October 31, 1986.

Lone Star's theory, which was accepted by the trial court, was that the contract was not repudiated before June 1, 1987. Paul Bosco, Lone Star's president, testified that Lone Star continued to work on the project into October 1986, and did some additional work in May 1987. Lone Star had construction equipment on the Property until May 1987. Bosco testified that the parties continued to work towards a resolution of the breach and that the Owner promised additional funding could be secured if some additional work could be completed. Bosco also testified it was his hope that if he continued to do work, the project could be brought to a stage of completion where it could be sold and Lone Star could be paid out of the proceeds. Lone Star filed a lien on the Property on November 3, 1986. The trial court made the following findings of fact:

23. During the period from November, 1986 through April, 1987, Lone Star, Park Lake, and various Enchanted Bays Partners negotiated concerning the amounts payable to Lone Star for progress payments for work then performed and materials supplied and concerning the completion of the Enchanted Bays Project and the Excavation Agreement. Lone Star at all times in good faith believed that only if the Enchanted Bays Project were successfully completed would Lone Star have a good chance of being paid in full, since the project would not bring enough to pay even the lenders on the project in a partially completed state. Lone Star had been working with many of the Enchanted Bays Partners for over three (3) years, since 1983.

24. In or about May, 1987, Lone Star believed that the Enchanted Bays Project had an opportunity to obtain either a sale or additional financing if some additional reclamation work were performed. Accordingly, in May, 1987, Lone Star performed additional reclamation work for the Enchanted Bays Project including Section Tract 6.

. . . .

45. Sometime after June 1, 1987, Lone Star began to believe that Park Lake would never obtain additional funding to complete the work on the Enchanted Bays Project.

Hubble relies primarily on Lone Star's pleadings to support its contention that Lone Star repudiated the contract when it temporarily stopped work on October 3, 1986. Lone Star's Original Petition states that Lone Star "stopped work on the project in or about October, 1986," and that "Lone Star's cessation of work under the contract was justified and excused by reason of the failure of the Venture to continue to make progress payments. . . ." The pleading does not speak of repudiation, however. There was evidence that Lone Star stopped work on October 3, 1986 and did no further work on the project until May 1987, when it did work on another section. Hubble also points to the November 4, 1986 lien as evidence of an earlier repudia-

tion by Lone Star, although this date is within four years of the filing of the suit.

We agree with the trial court that the preponderance of the evidence indicates that neither Lone Star nor Park Lake intended a repudiation before October 31, 1986, even though there had been a breach by Park Lake, and a partial work stoppage by Lone Star. As previously stated, repudiation is conduct that shows a *fixed* intention to abandon, renounce, and refuse to perform the contract. *Boerger,* 389 S.W.2d at 568. The failure of the owner to make timely progress payments is evidence of a partial breach but is not conclusive evidence of a repudiation of the complete continuing contract by the owner. Hubble did not rebut testimony by Bosco that both parties were working to cure the partial breach after October 31, 1986. We hold that the trial court's findings of fact are not against the great weight and preponderance of the evidence. Thus, the four-year statute of limitations had not run when Lone Star filed suit on October 31, 1990, and Hubble's limitation defense fails. Points of error one, two and three are overruled.

The judgment of the trial court is affirmed.