# NO. 12-14-00323-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *DAVID TUBB AND SUPERIOR SHOOTING SYSTEM, INC., APPELLANTS/CROSS-APPELLEES,* | § | *APPEAL FROM THE 7TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *ASPECT INTERNATIONAL, INC. AND JAMES STERLING, APPELLEES/CROSS-APPELLANTS* | § | *SMITH COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Aspect International, Inc. and James Sterling filed a motion for rehearing, which is denied. We withdraw the court's opinion dated October 31, 2016, and substitute the following opinion in its place.

David Tubb and Superior Shooting Systems, Inc. appeal the trial court's judgment rendered in favor of Aspect International, Inc. and James Sterling. Appellants raise three issues on appeal. We affirm in part and reverse and render in part.

## BACKGROUND

This case arises out of a venture between two corporations—Superior Shooting Systems, Inc. and its representative, Tubb, and Aspect International, Inc. and its representative, Sterling. The venture originated in late 2011 for the purpose of manufacturing high quality small arms ammunition at a high volume to sell to the public. Pursuant to the agreement, both companies would participate in control of the business and split the profits equally. Additionally, Superior agreed to fund the purchase of production equipment and materials, lend Tubb's name[1] to the

---

[1] Tubb is a well-known figure in the shooting community.

venture, and provide access to its distribution network. In return, Aspect agreed to contribute the amount Superior owed it on invoices for certain information technology (IT) work Sterling had performed for Superior, convert Sterling's garage into a manufacturing facility, obtain retail packaging for the ammunition, and run the manufacturing operation.

An engineering firm, FillPro, was retained to design and construct an ammunition loading machine capable of producing high quality precision ammunition. Superior funded the purchase of the machine. Sterling devised and, with FillPro, brought to fruition a hybrid computer-controlled loading system. The system used a computer interface that made the machine capable of high volume production and precision loading capabilities. Sterling maintained regular contact with FillPro during the design and construction of the machine. In October 2012, once construction was complete, FillPro installed the machine in Sterling's repurposed garage, trained Sterling, and certified the machine as production ready. However, no retail packaging was procured until mid to late January 2013.

Following several interactions with Tubb, Sterling grew concerned over whether Tubb was willing to proceed with the parties' venture as he originally had agreed. The two discussed reducing their agreement to writing and both agreed that a written agreement was necessary. By January 2013, however, Sterling concluded that Tubb no longer intended to perform the venture as agreed and demanded payment on the IT invoices.[2] On February 5, 2013, Appellees' lawyer sent a letter to Tubb accusing Appellants of repudiating the agreement.

On February 6, 2013, Appellees filed the instant suit and sought to recover for, among other things, breach of contract, quantum meruit, and promissory estoppel. The matter proceeded to a bench trial, following which the trial court rendered judgment for Appellees for breach of contract and awarded them $175,000.00 in restitution damages, subject to an offset of $35,019.00. The trial court further awarded Appellees attorney's fees, but found that Appellants were not entitled to recover attorney's fees. Thereafter, the trial court made written findings of fact and conclusions of law. This appeal followed.

### EVIDENTIARY SUFFICIENCY - REPUDIATION

In their first issue, Appellants argue that the evidence is legally insufficient to support the trial court's conclusion that Superior repudiated the parties' agreement.

---

[2] Superior paid Sterling on the IT invoices.

**Standard of Review**

In an appeal from a judgment after a bench trial, we accord the trial court's findings of fact the same weight as a jury's verdict. *Milton M. Cooke Co. v. First Bank & Trust*, 290 S.W.3d 297, 302 (Tex. App.–Houston [1st Dist.] 2009, no. pet.); *see Brown v. Brown*, 236 S.W.3d 343, 347 (Tex. App.–Houston [1st Dist.] 2007, no pet.). Unchallenged findings of fact are binding on an appellate court, unless the contrary is established as a matter of law or there is no evidence to support the finding. *Walker v. Anderson*, 232 S.W.3d 899, 907 (Tex. App.–Dallas 2007, no pet.); *see McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex.1986); *Mullins v. Mullins*, 202 S.W.3d 869, 874, 876–77 (Tex. App.–Dallas 2006, pet. denied). However, when an appellant challenges a trial court's findings of fact, an appellate court reviews those fact findings by the same standards it uses to review the sufficiency of the evidence to support a jury's findings. *See Pulley v. Milberger*, 198 S.W.3d 418, 426 (Tex. App.–Dallas 2006, pet. denied).

Thus, to determine whether legally sufficient evidence supports a challenged finding, we must consider evidence that favors the finding if a reasonable factfinder could consider it, and we must disregard evidence contrary to the challenged finding unless a reasonable factfinder could not disregard it. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). This Court may not sustain a legal insufficiency, or "no evidence," point unless the record demonstrates (1) a complete absence of evidence of a vital fact; (2) that the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) that the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810. More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact. *Driskill v. Ford Motor Co.*, 269 S.W.3d 199, 203 (Tex. App.–Texarkana 2008, no pet.) (citing *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003)).

We review conclusions of law by the trial court de novo and will uphold them if the judgment can be sustained on any legal theory supported by the evidence. *Brown*, 236 S.W.3d at 348. The trial court's conclusions of law are not subject to challenge for lack of factual

sufficiency, but we may review the legal conclusions drawn from the facts to determine their correctness. *Id.*

## Governing Law

As a defense to a breach of contract action, a defendant can assert that the plaintiff repudiated the contract. *See El Paso Prod. Co. v. Valence Oper. Co.*, 112 S.W.3d 616, 621 (Tex. App–Houston [1st Dist.] 2003, pet. denied). A plaintiff repudiates a contract if, without just excuse, it indicates by unconditional words or actions that it will not perform its contractual obligations. *Id.*; *see also Bans Props., L.L.C. v. Housing Auth. of City of Odessa*, 327 S.W.3d 310, 315 (Tex. App.–Eastland 2010, no pet.); *City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 738 (Tex. App.–Fort Worth 2008, pet. dism'd); *Hauglum v. Durst*, 769 S.W.2d 646, 651 (Tex. App.–Corpus Christi 1989, no writ). The plaintiff's conduct must show a fixed intention to abandon, renounce, and refuse to perform the contract. *City of The Colony*, 272 S.W.3d at 738; *Hubble v. Lone Star Contracting Corp.*, 883 S.W.2d 379, 383 (Tex. App.–Fort Worth 1994, writ denied); *Hauglum*, 769 S.W.2d at 651. If the plaintiff's refusal to perform its contractual obligations was based on a genuine mistake or misunderstanding about matters of fact or law, there is no repudiation. *Jenkins v. Jenkins*, 991 S.W.2d 440, 447 (Tex. App.–Fort Worth 1999, pet. denied); *McKenzie v. Farr*, 541 S.W.2d 879, 882 (Tex. App.–Beaumont 1976, writ ref'd n.r.e.).

Furthermore, the defendant can assert that it timely retracted its own repudiation by notifying the plaintiff that it intended to perform. *See Griffith v. Porter*, 817 S.W.2d 131, 135 (Tex. App.–Tyler 1991, no writ); *Valdina Farms, Inc. v. Brown, Beasley & Assocs.*, 733 S.W.2d 688, 692 (Tex. App.–San Antonio 1987, no writ). The defendant must retract its repudiation before the plaintiff either has materially changed its position in reliance on the repudiation or has notified the defendant that it considers the repudiation to be final. *Glass v. Anderson*, 596 S.W.2d 507, 510 (Tex. 1980); *Juarez v. Hamner*, 674 S.W.2d 856, 860 (Tex. App.–Tyler 1984, no writ). Whether a party has repudiated an agreement is a question of fact. *See Berg v. Wilson*, 353 S.W.3d 166, 176 (Tex. App.–Texarkana 2011, pet. denied).

## Findings of Fact Pertaining to Repudiation

In the case at hand, the trial court expressly found that Tubb repudiated the parties' venture on behalf of Superior as set forth below.

4

• There was a considerable amount of evidence introduced at trial that [Aspect] substantially performed its obligations under the Agreement and would have fully performed but for the breach and repudiation of the Agreement by Superior found by the Court below.

• Beginning shortly prior to [Tubb's] trip to Tyler and continuing thereafter, a series of actions and events occurred, which, considered together, constitute a breach and repudiation of the Agreement by Superior.

In support of these findings, the trial court also made the following relevant findings of fact.

• [N]either [Appellees] nor [Appellants] executed any form of written agreements.

• In October 2012, the ammunition loading machine (after it was completed and ready for production use) was transported by Fillpro to the facility prepared by [Aspect] in Tyler, Texas, where it was installed by [Rue] Marshall. Marshall, who the evidence showed to have extensive experience in power loading equipment, including such equipment used in the munitions industry, spent several days at the Tyler facility training Sterling on the equipment and certifying the equipment as "production-ready." FillPro had actually load-tested the machine at their facility in Colorado before shipping it to Texas.

• Sterling and Tubb planned for Tubb to make a visit to the facility in Tyler in November [2012] to examine the loading machine and add some [dies] for a particular caliber of ammunition.

• Just before the November 2012 trip to Tyler, Sterling received a call from Tubb questioning the amount of contributions of money and property that [Appellants] had made to the enterprise. The call caused Sterling enough concern that he emailed Tubb on November 8, 2012, raising his concern and advising Tubb that if there was going to be a change in the Agreement, the parties needed to discuss it before the trip. Tubb followed up with a call, telling Sterling that there would be no change in the Agreement since Sterling would be doing all the work.

• Tubb announced over a dinner during the November 2012 trip, with the Sterlings and other witnesses present, that his son, Cannon Tubb, should be the one to run the manufacturing operation of the business; something that caught others around the table by surprise and was contrary to a material term of the Agreement.

• The next morning[,] Tubb advised Sterling that the manufacturing equipment and operation would need to be moved to Canadian, a position in conflict with the parties' Agreement that the operation would be located in Tyler, Texas, and run by [Aspect]. Although Tubb relented on an immediate removal, he advised Sterling that the equipment and operation would eventually be moved to Canadian, Texas. This position . . . would remove [Aspect] as manufacturer, since [Aspect] was based in Tyler, [Texas].

• There was evidence introduced of communications during the November trip between Tubb's wife, Sue Tubb, and Superior's accountant, Marilyn Ault, which appeared to call into question Sterling's integrity and other material terms the parties had agreed upon. Sue Tubb likened the situation to [Appellants'] former business partner and company manager, Brandon Cole, which ended in litigation and a dissolution of their business relationship, expressing concern as to whether her husband would again be "taken advantage of." Ault expressed the belief that the Agreement regarding how the revenues would be shared was not right.

• [Following the November 2012 trip,] Tubb claimed that he could not get additional bullet feeders that would be used in the manufacturing operation, but when Sterling looked into it,

he discovered that the equipment was readily available. In an exchange between the two men, Tubb told Sterling he [would] solicit from one of his suppliers at the next trade show additional materials, but then told the supplier at the show no additional brass [was] needed. [Appellants] did not provide the bullets needed to bring the final product to market. The 18,000 bullets that were at [Aspect's] facility were removed by Superior personnel, transported to Canadian[,] and never returned. It was later determined that the bullets, which per the agreement were to be sold by the enterprise, were being sold by Tubb's company, DTAC. This refusal to provide the necessary materials constituted a breach of the Agreement.

## Analysis

We have reviewed the record and have found sufficient evidentiary support for these findings of fact. Appellants argue, however, that the trial court's findings and other evidence do not support the finding that they repudiated the contract. Specifically, among other reasons, Appellant's make the following arguments.

• Neither Tubb nor Superior made a fixed and unequivocal renunciation of the venture.

• The parties' agreement did not set a deadline for production to begin.

• Moving the business to Canadian, Texas at some point in the future was contemplated by the agreement and, in any event, Tubb retracted the statement.

• Appellees never accepted any repudiation by Appellants, but rather, continued to act as if the agreement were still in effect.

• Superior never intentionally withheld supplies because the evidence supports that the materials in question were on order.

• While the machine could have produced ammunition, further adjustments to the machine and two to three months for Sterling to improve his proficiency in operating the machine to produce ammunition on a commercial scale were required. Any delay in getting materials was not a repudiation because they could not be used at that point.

• Sufficient packaging materials were not available until mid-January 2013.

• Sterling repudiated the agreement on January 7, 2013, when he requested to be paid by Appellants for the IT work he was supposed to have contributed as capital to the venture.

We agree with Appellants' assertions that (1) the agreement contained no fixed date for production to begin and (2) producing saleable ammunition could not have begun until packaging was obtained. Moreover, we agree that several actions on Tubb's part which could have constituted repudiation were later withdrawn by Tubb while Sterling and Aspect continued to perform as if the agreement were still in effect. Nonetheless, even if these earlier incidents were not repudiations, they offer context in which Tubbs's later acts can be considered.

Among these later acts is Tubb's continued ambivalence about entering into a written agreement. The record conclusively reflects that through a series of exchanges beginning before the Tyler trip and continuing thereafter, the parties discussed reducing their agreement to writing. The record further reflects that these conversations continued throughout 2012, and by year's end, during a recorded phone conversation on December 31, 2012, Tubb agreed that the parties would need a written agreement if they were to proceed with the venture. But, as the trial court found, the parties never entered into any sort of written agreement. Indeed, we note that a written contract was not a condition of the original agreement, but the evidence supports the implied finding[3] that the parties later agreed that it was a requisite to their moving forward with the venture.

On January 4 and 7, 2013, Tubb and Sterling had more phone conversations, which were recorded. During the January 4 conversation, the parties stated, in pertinent part, as follows:

> Sterling: [T]he purpose of me trying to get together with you face-to-face is try to, you know, get my attorney over there and maybe draw up some kind of agreement. But if we can't do that, then there's no sense in me coming over.

> Tubb: Okay. Well, I mean, obviously I would be happy to visit, you know, there's no question about that.

> Sterling: Well, you know, we talk all the time on the phone, you know.

> Tubb: Sure . . . . Well, maybe we ought to just sit down and budget some time or something, sit down, and, you know, visit and we'll go back through and, you know, reiterate and cover our points and see if we can move forward here, you know.

> Sterling: Well, I think that's probably what we ought to do. I think that something has happened somewhere along the way and we're - - trying to keep my bearings here and, you know, exactly everything that I said I would do per our agreement and I don't - - I don't think you're really happy and I don't want you to be unhappy and - -

> Tubb: Sure, yeah.

> Sterling: So whatever we got to do here, we got to do.

During the January 7 conversation, the following exchange occurred:

> Sterling: My agreement was that I deferred all my time and expense as equity in the joint venture and so I was expecting to manufacture the ammunition per agreed for 50 percent of the net profit.

---

[3] Whether there is a contract and whether a contract has been modified are generally questions of fact. *See Hathaway v. Gen. Mills, Inc.*, 711 S.W.2d 227, 229 (Tex. 1986); *Advantage Physical Therapy, Inc. v. Cruse*, 165 S.W.3d 21, 24 (Tex. App.–Houston [14th Dist.] 2005, no pet.).

Tubb: Absolutely, that's, yeah, understood and I see nothing wrong with that . . . .

. . . .

Sterling: [L]ike I say, my agreement was that I would defer all of my time and expenses in equity in the joint venture. And if there is no joint venture[,] then that doesn't apply . . . .

. . . .

I guess you need to decide what you want to do. Do you want to move the machines to Canadian now and - -

. . . [A]nd the reason the machine is here today is because I don't live in Canadian. I'm the manufacturer. So if the machine goes to Canadian, then I'm no longer the manufacturer . . . .

Tubb: Understood. I don't know, James, about that . . . . I think in the end game if we looked at this going a couple of years down the road, if we had other machines, it would have made more sense to have it in Canadian.

. . . .

Sterling: [W]e're right in the middle of a time where ammunition is one of the hottest commodities there is on the planet. And what I would - - what I wanted to hear is, James, how can I help you and what can I do to get us to get this product out the door[,] and I haven't heard any of that. And it seems to be more of a conflict about where the machine is than anything else . . . .

. . . .

Okay. You think about it and let me know which direction you want to go . . . . I've told you this from day one. The good contracts make good friends. And I've been trying over and over again to get some agreement in writing so that we don't - - because that - - agreements in writing, you don't have these conflicts. You don't have miscommunication. Everybody knows what their job is and what their responsibilities are. And if somebody forgets something, then you can go right back to the contract and say this is what we agreed to, you know.

. . . .

Tubb: Well, I'll give it some thought, James . . . .

Based on these conversations and all of the events preceding them, we conclude that the trial court reasonably could have found that Tubb, despite some statements in support of the venture and despite the overtures of support for the venture put forth by Sterling, had no interest in executing a written agreement or proceeding further with the venture. Sterling's January 7, 2013 email makes clear that he is seeking payment because of Tubb's refusal to execute a written agreement. Based on our review of the record, we conclude that the evidence supports the trial court's finding that Tubb was unwilling to enter into a written agreement, and that his repeated failure to do so over time, in itself, amounted to repudiation of the agreement. By his January 7,

8

2013 email seeking payment on the IT invoices, Sterling accepted this repudiation as a breach of contract.

Furthermore, Tubb's act of having 18,000 shell casings removed from Sterling's garage, loading them himself, failing to return them, and, ultimately, attempting to sell them through a third party vendor could be considered by Sterling as a definite indication that Tubb unconditionally intended that Superior would not perform its obligations under the agreement. This act, considered in the context of Tubb's other actions preceding it, was in complete contravention of the parties' agreement regardless of whether production for sale was then possible. The record does not indicate an exact date upon which Sterling discovered this fact. But the evidence reflects that by mid to late January 2013, Tubb had not returned to Sterling this ammunition he was purportedly modifying for subsonic use, nor had he delivered other ammunition components to be loaded by Sterling in accordance with the terms of the agreement. We conclude that the trial court reasonably could have found that Sterling was entitled to consider these actions by Tubb as a further repudiation of the parties' agreement. On February 5, 2013, Appellees' attorney set a letter to Tubb and Superior stating that their actions amounted to a repudiation of the venture and made it clear that they had no intention of abiding by the original agreement.

Based on the foregoing, we hold that the evidence is legally sufficient to support the trial court's conclusion that Appellants repudiated the parties' agreement. Appellants' first issue is overruled.

### NATURE OF THE PARTIES' VENTURE - RECOVERY OF RESTITUTION DAMAGES

In part of their second issue, Appellants argue that the evidence is legally insufficient to support the trial court's award of damages to Aspect. Specifically, Appellants argue that there is no basis for recovery because the venture was a partnership and, therefore, Aspect, as a partner, cannot be compensated for its services performed for the partnership.

The trial court found that the parties did not create a partnership. Thus, we will review that finding for legal sufficiency. The burden of proof is on the person seeking to establish the existence of a partnership or joint venture. *See Ben Fitzgerald Realty Co. v. Muller*, 846 S.W.2d 110, 120 (Tex. App.–Tyler 1993, writ denied); *see also Wortham v. Dow Chem. Co.*, 179 S.W.3d 189, 195 (Tex. App.–Houston [14th Dist.] 2005, no pet.). Thus, when a party attacks the

9

legal sufficiency of an adverse finding on an issue on which it had the burden of proof, it must demonstrate on appeal that the evidence establishes conclusively, or as a matter of law, all vital facts in support of the finding sought. *Velvet Snout, LLC v. Sharp*, 441 S.W.3d 448, 450 (Tex. App.–El Paso 2014, no pet.).

**Governing Law**

Because the parties' venture originated in late 2011, the question of whether it constitutes a partnership is governed by the Texas Business Organizations Code. *See Ingram v. Deere*, 288 S.W.3d 886, 894 n.4 (Tex. 2009). The question of whether a partnership exists is primarily a question of fact. *Muller*, 846 S.W.2d at 120. With exceptions not applicable here, an association of two or more persons[4] to carry on a business for profit as owners creates a partnership, regardless of whether (1) the persons intend to create a partnership or (2) the association is called a "partnership," "joint venture," or other name. *See* TEX. BUS. ORGS. CODE ANN. § 152.051(b) (West 2012). In determining whether a partnership was created, we consider several factors, including (1) the parties' receipt or right to receive a share of profits of the business; (2) any expression of an intent to be partners in the business; (3) participation or right to participate in control of the business; (4) any agreement to share or sharing losses of the business or liability for claims by third parties against the business; and (5) any agreement to contribute or contributing money or property to the business. *Id.* § 152.052(a). But an agreement by the owners of a business to share losses is not necessary to create a partnership. *See id.* § 152.052(c). We review these factors under the totality of the circumstances. *See Ingram*, 288 S.W.3d at 898.

In *Ingram*, the court noted the difficulty in applying this test. *See id.* The court described the challenge of the test as its application between two points on a continuum. *Id.* On one end, an absence of any evidence of the factors, or even conclusive evidence of only one factor would be insufficient to establish the existence of a partnership. *Id.* On the other end of the spectrum, conclusive evidence of all of the factors will establish the existence of a partnership as a matter of law. *Id.*

In conducting our review, we are mindful that a totality of the circumstances test presumes a multitude of potential factors and a balancing of evidence on either side. *Cf. Perry*

---

[4] "Person" means, among other things, "an individual or a corporation[.]" TEX. BUS. ORG. CODE ANN. § 1.002(69-b) (West Supp. 2016).

*Homes v. Cull*, 258 S.W.3d 580, 598 (Tex. 2008). If appellate courts must affirm every time there is some factor that was not negated or some evidence on either side, then no ruling based on the totality of the circumstances could ever be reversed. *Id.* That standard of review would be the same as no review at all. *Id.* Thus, while we consider each of the aforementioned factors, we consider their aggregate weight along the "continuum" as referenced in *Ingram* to determine whether the trial court's finding is supported by sufficient evidence.

**Analysis of Factors Pertaining to Creation of a Partnership**

In the instant case, the trial court expressly found that the parties did not enter into a partnership under *Ingram* and Section 152.052. In conjunction with this finding, the trial court made the following findings:

• [Per the terms of the parties' agreement,] Aspect would be entrusted with the manufacturing operation of the business and would perform the labor and work necessary to bring the product to market. [Aspect], through Sterling, would use its computer and business skills to procure a manufacturing solution, coordinate the overall design and assembly of the loading equipment and operation . . . , and oversee the manufacture and sale of the finished product.

• During the course of their dealings and in sworn testimony, Superior and Aspect expressed the general intent to be "partners" in the business venture.

• Neither Plaintiffs nor Defendants executed any form of written agreements.

• Neither Plaintiffs nor Defendants executed any form of written joint venture or partnership agreements.

• Neither Plaintiffs nor Defendants executed any form of written documents to incorporate the proposed new business as a corporation or limited liability company.

• Neither Plaintiffs nor Defendants filed any U.S. tax returns for the proposed new business or filed applications to obtain a U.S. tax identification number for the proposed new business.

• No new bank account was set up for the venture, rather Plaintiffs and Defendants each paid for items individually.

• Both Sterling and Tubb agreed to share the profits equally.

• Sterling and Tubb apparently never contemplated any losses and, therefore, never agreed to share the losses or liabilities in any fashion.

• Both Sterling and Tubb agreed to "go into business together" on the ammunition project, but it is clear they had no agreement as to the form of the entity, which continued to be discussed until and after the filing of the lawsuit.

• Tubb and Superior held and provided the "checkbook" and, therefore, held all the rights to control the business and right to make the executive decisions.

• Both Tubb and Sterling contributed property to the venture.

*Agreement to Share Profits and/or Losses*

The trial court's finding that the parties agreed to share profits equally is an uncontested fact. This factor weighs heavily in support of a finding that the nature of the venture was a partnership. *See* TEX. BUS. ORGS. CODE ANN. §§ 152.051(b), 152.052(a)(1); *Ingram*, 288 S.W.3d at 896 (stating that the Texas Revised Partnership Act comments note that traditional import of sharing profits as well as control over business will probably continue to be most important factors); *see also Nguyen v. Hoang*, No. 01-15-00352-CV, 2016 WL 6087693, at *8 (Tex. App.–Houston [1st Dist.] Oct. 18, 2016, pet. filed) (right to control business and sharing profits most important factors in determining existence of partnership under Texas Business Organizations Code). Furthermore, the record is in accord with the trial court's finding that there was no contemplated agreement concerning losses. However, an agreement by the owners of a business to share losses is not necessary to create a partnership. *See* TEX. BUS. ORGS. CODE ANN. § 152.052(c). Thus, while the existence of an agreement to share losses would be indicative of a partnership, the absence of such an agreement does not indicate that no partnership existed. *Compare id. with id.* § 152.052(a)(4)(A); *see Ingram*, 288 S.W.3d at 902 (while absence of agreement to share losses is not dispositive of existence of partnership, existence of such an agreement could support argument that partnership existed).

*No Agreement Regarding the Nature of the Entity*

The record is in accord with the trial court's finding that Tubb and Sterling had no agreement regarding the nature of the entity. But we cannot overlook the fact that the trial court made no finding concerning what type of entity the parties did, in fact, create.[5] Appellants contend there is evidence that Sterling proposed written agreements concerning entities other than partnerships. But the record likewise supports that Tubb never accepted any of Sterling's proposed agreements. Appellant's cite *Hoss v. Alarding*, 338 S.W.3d 635, 649 (Tex. App.–Dallas 2011, no pet.), in support of their contention that there is no evidence that a tax return was filed on behalf of the entity. But in *Hoss*, the court's consideration of the fact that no tax return

---

[5] The record indicates that in numerous instances, both Tubb and Sterling referred to the entity as a "joint venture." As the supreme court noted in *Ingram*, there is no "legal or logical reason for distinguishing a joint venture from a partnership on the question of formation of the entity." *Ingram*, 288 S.W.3d at 894 n.2; *see* TEX. BUS. ORGS. CODE ANN. § 152.051(b)(2).

was filed for the entity was predicated by the statement that the alleged partnership had existed for "several years." *Id.* In this case, the entity did not exist for much more than one year, and it is reasonable to conclude from the evidence that both parties had doubts about its future several months before Sterling formally repudiated the agreement. Thus, we conclude that the fact that no tax return was filed for the entity is evidence a factfinder reasonably could disregard. *Cf. id.* Ultimately, the trial court's finding and the parties' failure to agree on another form for the entity lends support to a conclusion that the entity was a partnership. *See* TEX. BUS. ORGS. CODE ANN. § 152.051(b).

*Participation or Right to Participate in Control of the Business*

The trial court also found that Appellants held all the rights to control the business and right to make the executive decisions because they held the "checkbook." The right to "control" a business is the right to make executive decisions. *Ingram*, 288 S.W.3d at 901 (citing *Brown v. Cole*, 291 S.W.2d 704, 710 (Tex. 1956)) (evidence of control includes exercising authority over business's operations).[6]

The "checkbook," as referenced in the trial court's findings, was not the property of the entity. Indeed, the record reflects that the entity had no checking account or other entity-owned property. However, the record supports that, because of Tubb's shooting expertise and outlay of capital to purchase the loading machine, Appellants made many decisions concerning the finer details of the ammunition that would be manufactured and held responsibilities concerning the procurement of raw materials.

However, the trial court's finding concerning the terms of the agreement and the evidence of record nonetheless establishes that Appellees had the right to make, and made, many decisions. These decisions included helping to devise a hybrid computer-controlled loading system for the loading machine, the preparation of Sterling's garage to be used as a

---

[6] *See also* **Guerrero v. Salinas**, No. 13-05-323-CV, 2006 WL 2294578, at *11 (Tex. App.–Corpus Christi Aug. 10, 2006, no pet.) (mem. op.) (concluding that evidence of management or control of the business was the right to write checks on the business's checking account); **Tierra Sol Joint Venture v. City of El Paso**, 155 S.W.3d 503, 508 (Tex. App.–El Paso 2004, pet. denied) (noting that party does not have control of business if party does not have control over and access to business's books); **Price v. Wrather**, 443 S.W.2d 348, 351–52 (Tex. Civ. App.–Dallas 1969, writ ref'd n.r.e.) (noting that control of business could be receiving and managing all of the business's assets and monies). Although in **Ingram**, Deere argued that he had "equal" right of control, the supreme court did not hold than an equal right of control over every aspect of the business was required. *See* **Ingram**, 288 S.W.3d at 901–02.

13

manufacturing location for the business, devising the "Absolute" branding for the ammunition, and the procurement of packaging for the ammunition.

The record further indicates that when Tubb suggested to Sterling that the manufacturing should be moved to Canadian, Texas, before manufacturing even had commenced, Sterling strongly objected, and Tubb relented on the issue. This evidence clearly indicates that Sterling and Aspect had the right to make an executive decision concerning the location of the business's manufacturing facility.

Based on our review of the record, we conclude that the evidence supporting the trial court's finding Appellants held *all* the rights to control the business and right to make the executive decisions was no more than a scintilla. *See Driskill*, 269 S.W.3d at 203. Instead, the trial court's finding concerning Appellees' obligations under the agreement includes responsibilities that amount to a right to participate in the control of the business, and the evidence conclusively supports that Appellees participated in the control of the business. *See* TEX. BUS. ORGS. CODE ANN. 152.052(a)(3); *see also Ingram*, 288 S.W.3d at 896 (import of sharing profits as well as control over business will probably continue to be most important factors); *see also Nguyen*, 2016 WL 6087693, at *8.

### *Contribution of Money or Property to the Business*

The trial court further found that both Tubb and Sterling contributed property to the venture. Indeed, the evidence demonstrates that Tubb contributed approximately $250,000.00 to procure the machine while Sterling contributed value in the form of IT invoices for work he previously had done for Appellants in the amount of approximately $35,000.00. Of course, Tubb sought to maintain Appellants' ownership of the machine, but his permitting it to be used to manufacture ammunition for the venture nonetheless amounted to a contribution of value to the entity. *See* TEX. BUS. ORGS. CODE ANN. § 1.002(9) (West Supp. 2016) ("'Contribution' means a tangible or intangible benefit that a person transfers to an entity . . ."). Appellants further agreed to lend Tubb's name, well known in the shooting community, to the venture as additional value. *See Ingram*, 288 S.W.3d at 902 ("[A]n individual's reputation can be property that is contributed to the partnership."). Thus, we conclude that both parties' contributions of property to the venture supports the creation of a partnership. *See* TEX. BUS. ORGS. CODE ANN. § 152.052(5).

14

*Expression of Intent to be Partners in the Business*

Lastly, the trial court found that Superior and Aspect expressed the general intent to be "partners" in the business venture. *But see **Ingram***, 288 S.W.3d at 900 (merely referring to another person as "partner" in a situation where recipient of message would not expect declarant to make a statement of legal significance is not enough; courts should look to terminology used by putative partners, the context in which statements were made, and identity of speaker and listener). Appellees argue that the evidence supports that neither Tubb nor Sterling intended to create a partnership. At trial, Sterling testified that he did not intend to create a partnership and never called the business a partnership. Appellants' counsel sought to impeach Sterling's testimony with his prior deposition testimony in which he referred to the project as a "joint venture partnership." Tubb's responses and amended responses to interrogatories were similarly contradictory on the subject.

However, we are mindful that while intent is among the factors indicating that persons have created a partnership, a partnership may be created regardless of whether the persons intended to create it. *Compare* TEX. BUS. ORGS. CODE ANN. § 152.051(b)(1) *with* TEX. BUS. ORGS. CODE ANN. § 152.052(a)(2). Furthermore, apart from their self-serving testimonies, in their communications with one another both parties repeatedly referred to the ammunition project as a "joint venture." *See id.* § 152.051(b)(2) (except under circumstances not applicable here, association of two or more persons to carry on business for profit as owners creates partnership regardless of whether the association is called "partnership," "joint venture," or other name).

In sum, while the evidence of an expression of intent to create a partnership is a factor that would support the creation of a partnership, the lack of such intent, or expressions of a vague, yet unrealized, intent to operate under some other form, absent the actual creation of some other form of statutorily derived entity,[7] should not be given weight in favor of finding that no partnership existed. *Cf. **Ingram***, 288 S.W.3d at 903 (absence of agreement to share losses not dispositive of existence of partnership, but existence of such an agreement could support argument that partnership existed).

---

[7] *See* TEX. BUS. ORGS. CODE ANN. § 151.051(c).

15

*Summation*

In conclusion, the evidence supports the trial court's findings on profit sharing, lack of a formal agreement regarding the nature of the entity, and contribution of property to the entity. Each of these factors supports a finding that a partnership was created. Furthermore, the evidence supports the trial court's finding that there is no evidence of an agreement to share losses, which, as set forth above, is not required to create a partnership. Moreover, the trial court's finding concerning Appellants' holding *all* of the rights to control of the business amounted to less than a scintilla in the face of conclusive contrary evidence that Appellees had a right to participate, and did participate, in the control of the business. Further still, the testimonies from both Tubb and Sterling concerning whether they intended to create a partnership was contradictory and self-serving despite the fact that both parties repeatedly referred to the project as a "joint venture." But, ultimately, a partnership could have been created regardless of the parties' noncommittal expressions of intent or the fact that the parties repeatedly referred to the project as a "joint venture."

Based on our review of the trial court's findings and the record as a whole, we conclude that, under the totality of the circumstances, the trial court's finding that the parties did not create a partnership is, at most, supported by less than a scintilla of evidence. *See id.* at 898. To the contrary, the evidence of record when considered in light of the aforementioned factors and the "continuum" described in **Ingram** conclusively establishes the existence of a partnership as defined by Section 152.051(b). *See id.*; *see also* **Perry Homes**, 258 S.W.3d at 598. Therefore, we hold that the evidence is legally insufficient to support the trial court's finding concerning the existence of a partnership. *See* **City of Keller**, 168 S.W.3d at 810.

## Recovery of Restitution Damages

A partner is not entitled to receive compensation for services performed for a partnership other than reasonable compensation for services rendered in winding up the business of the partnership. TEX. BUS. ORGS. CODE ANN. § 152.203(c) (West 2012). In the instant case, the trial court found that Appellees were not entitled to damages for lost profits. Rather, the trial court found that Appellees were entitled to restitution damages based on the value of the services Sterling provided to the business from October 2011 through January 2013. Because Superior and Aspect were partners, the services Sterling performed on Aspect's behalf for the partnership during the venture are not subject to compensation. *See id.* Therefore, we hold that the trial

court erred in awarding Appellees restitution damages for services performed for the partnership during the venture.

Appellants' second issue is sustained in part.[8]


### ATTORNEY'S FEES

In their third issue, Appellants argue that the trial court abused its discretion by failing to award them attorney's fees because they successfully recovered from Appellees by virtue of the trial court's determination that they were entitled to an offset on Appellants' damages award in the amount of $35,019.00. An appellate court reviews a trial court's decision on the award of attorney's fees for an abuse of discretion. *Paul v. Merrill Lynch Trust Co. of Tex.*, 183 S.W.3d 805, 812 (Tex. App.–Waco 2005, no pet.). A trial court abuses its discretion when it acts without reference to any guiding rules or principles, or stated another way, when the trial court acts in an arbitrary and unreasonable manner. *Id.*

Appellants argue that Appellees breached the agreement by requiring Superior to pay its IT invoices and the trial court's award of an offset indicates that it agreed with this argument. However, Appellants did not challenge the trial court's conclusion of law that they "take nothing as to their claims of fraud, conversion and breach of contract." Therefore, they are not entitled to recover attorney's fees under Texas Civil Practice and Remedies Code, Section 38.001. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2015).

Moreover, before a court can award attorney's fees under Section 38.001, the party requesting the fees must prove they are reasonable and necessary. *See Manon v. Tejas Toyota, Inc.*, 162 S.W.3d 743, 751 (Tex. App.–Houston [14th Dist.] 2005, no pet.). In concluding that Appellants were "not entitled to attorney's fees[,]" the trial court implicitly found that there was no proof that any such fees were reasonable and necessary. *See* TEX. R. CIV. P. 299. Appellants have not challenged this implied finding on appeal nor has our review of the record uncovered any evidence offered to support the necessary element that such fees were reasonable and necessary.

For the foregoing reasons, we hold that the trial court did not abuse its discretion in declining to award Appellants attorney's fees. Appellants' third issue is overruled.

---

[8] As a result of our having sustained Appellants' second issue in part, we need not consider the remaining arguments comprising Appellants' second issue. *See* TEX. R. APP. P. 47.1.

## DISPOSITION

We have sustained Appellants' second issue in part and overruled Appellants' first and third issues. Accordingly, we *reverse* the trial court's judgment in part insofar as it awards restitution damages to Appellees and *render* judgment that Appellees take nothing. We *affirm* the remainder of the trial court's judgment.

BRIAN HOYLE
Justice

Opinion delivered January 18, 2017.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

18